UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------

MAYA PYSKATY,

         Plaintiff,

v.

WIDE WORLD OF CARS, LLC d/b/a
WIDE WORLD BMW;
BMW BANK of NORTH AMERICA;

         Defendants.

------------------------------------------------------------------

**15 CV 1600**

**COMPLAINT**

**AND JURY DEMAND**



## INTRODUCTION

1. This is an action for actual damages, treble damages, punitive damages, declaratory judgment, injunctive relief, attorney's fees and costs brought by an individual consumer, Plaintiff Maya Pyskaty (nee Sieber) ("Plaintiff" or "Ms. Pyskaty"), seeking redress for unlawful practices relating to her purchase of a used 2010 BMW 750LXI luxury automobile.

2. Specifically, as set forth below, Defendants violated the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 *et seq.*, New York General Business Law § 349, New York General Business Law § 350; New York Uniform Commercial Code § 2-313 (breach of express warranty), and New York Uniform Commercial Code § 2-314 (breach of implied warranty of merchantability). Defendants are also liable to Plaintiff for Fraud.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 15 U.S.C. § 2310(d)(1)(B) and § 2310(d)(3), and pursuant to 28 U.S.C. § 1332.

1

4. With regard to 28 U.S.C. § 1332, as set forth below, the parties are completely diverse and the amount in controversy exceeds $75,000.00.

5. With regard to 15 U.S.C. § 2310(d)(1)(B) and § 2310(d)(3), as set forth below, the amount in controversy with regard to "all claims to be determined in the suit" is over $50,000.

6. The Court has authority to issue a declaratory judgment by virtue of 28 U.S.C. § 2201 and § 2202.

7. This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8. Venue in this District is proper under 28 U.S.C § 1391 because a substantial part of the events and omissions complained of took place in this District and Defendant Wide World of Cars, LLC maintains offices, transact business, and is otherwise found in this district.

**THE PARTIES**

9. Plaintiff is (and has at all relevant times been) a resident of Lafayette Township New Jersey.

10. Defendant Wide World of Cars, LLC d/b/a Wide World BMW (WWBMW) is an auto dealership in the business of selling new and used vehicles, with its principal place of business in Spring Valley, New York. WWBMW participated in and benefitted from the transaction described herein.

11. Defendant BMW Bank of North America (BMW-BNA) is a corporation or national banking association headquartered in Salt Lake City, Utah.

12. The basis for BMW-BNA's liability for the unlawful and tortious conduct set forth herein is its status as an Assignee of the Retail Installment Contract executed by Ms. Pyskaty and WWBMW, which renders BMW-BNA subject to all claims and defenses which Ms. Pyskaty may assert against WWBMW, pursuant to state and federal law (e.g. the FTC Holder Rule, and the New York Motor Vehicle Installment Sales Act).

## FACTS

13. On October 31, 2013, Ms. Pyskaty and her husband Steve Pyskaty went to WWBMW and discussed the purchase of a certified pre-owned BMW that would be suitable for Ms. Pyskaty's personal, non-commercial use.

14. Ms. Pyskaty's husband had seen a car advertised on the dealership's website that offered it for sale as a Certified Pre-Owned BMW and offered 0.9% APR on financing for all CPO vehicles.

15. At the Dealership on October 31, 2013, however, the Plaintiff and her husband were informed by a sales person that the vehicle advertised on the website had already been sold.

16. The dealership salesperson, Moon Hasan, then attempted to sell Ms. Pyskaty a different used BMW that was on the dealership's lot.

17. After test driving that second car and expressing her interest in it, Mr. Hasan informed Ms. Pyskaty that the second car was not yet certified, and if she wanted that BMW-backed certification, it would add $2,000 - $3,000 to the price of the vehicle.

18. Mr. Hasan also informed Ms. Pyskaty that, as the vehicle was not certified as a pre-owned at that time it would not be eligible for the special interest rate advertised on the website and instead any financing on the second car would be subject to 6% APR.

3

19. Ms. Pyskaty and her husband declined to purchase the second car as it was not available on the terms that had been advertised for CPO's on the dealerships website.

20. As they were leaving the dealership, however, the couple saw a third vehicle, a 2010 BMW 750LXI VIN# WBAKC8C54ACY68053 ("the Vehicle"), which was displayed in the showroom, and being held out for sale as a "certified pre-owned" (CPO) BMW. To wit: on the windshield, the Vehicle had a sticker announcing its sale as a CPO.

21. Ms. Pyskaty also asked the salesperson, Moon Hasan, about the history of the Vehicle and physical condition. She specifically asked if the Vehicle had been in an accident.

22. Mr. Hasan responded that the Vehicle had no accident history, was "perfect" and had a "clean" Carfax.

23. Mr. Hasan further stated that both he and a manager named "Joey" had been driving the car and had both determined that it was a good car.

24. In addition, to further convince Ms. Pyskaty that the Vehicle had no accident history, the salesperson provided Ms. Pyskaty with what purported to be a clean Carfax report, dated October 31, 2013.

25. The sales person also confirmed that the Vehicle was a CPO and had passed the inspection requirement for BMW CPO's.

26. The "Carfax" report also confirms that the Vehicle was put up for sale as a CPO on October 10, 2013.

27. Relying on these representations, Ms. Pyskaty agreed to purchase the Vehicle for $51,195, which included a premium for the CPO Certification.

28. Ms. Pyskaty traded in her 2010 BMW M5 which left her with a balance of about $20,000 on her previous note, put down a deposit of $2,000, and financed the balance

4

of the Vehicle purchase price (including the $20,000 remaining from the previous note).

29. Within the first week of the purchase, Ms. Pyskaty noticed that the Vehicle ran rough and vibrated while driving.

30. Mr. Pyskaty, Plaintiff's husband, called the Dealership at that time and spoke with an agent in the service department, informing the Dealership of the vibration.

31. He was told by the Service Department that the car has run flat tires; that after the car sits for a bit the tires slightly indent; that the vibration is normal until the tires heat up with driving; and that the vibration should then go away.

32. After a few more weeks, Plaintiff noticed that the vehicle vibration was still occurring and had not gone away as promised.

33. Plaintiff also noticed at about this time that the Vehicle's engine consumed large amounts of oil.

34. For example: after the first 1,000 miles the low oil light came on, and after giving the engine a quart of oil, within a week, the engine light for low oil came on again, at which time, upon inspection, Plaintiff discovered that the engine required an additional quart of oil.

35. On November 29, 2013, Ms. Pyskaty-Pyskaty brought the Vehicle to the nearest BMW dealership service center, Open Road BMW in Newton, NJ and explained all of these problems.

36. The BMW technician at Open Road BMW agreed that the car was running rough, and was consuming an excessive amount of oil, and informed Plaintiff that the problem might be due to a "clogged breather" in the engine.

5

37. Open Road's Service Department then informed Ms. Pyskaty that when they contacted BMW-BNA to receive authorization to do the repair, they were told not to repair the vehicle, but instead to have Plaintiff monitor the oil consumption and to bring the car back when the alert for low oil or engine malfunction came on.

38. As for Plaintiff's complaint regarding the vehicle vibration, Open Road BMW's service department told Plaintiff that they had tightened some suspension parts in the front end of the car.

39. Plaintiff monitored her oil consumption as requested. By 600 miles additional, the engine dipstick read approximately half-down; by 1000 miles additional, the oil was low and the alert had once again come on.

40. Plaintiff brought the vehicle back as instructed, and again complained that the vehicle's oil consumption was excessive.

41. Open Road's service manager, Alan Carpini, informed Plaintiff at that time that the vehicle's oil consumption was "normal". Open Road merely topped off the oil and declined to fix the vehicle.

42. In January 2014, the Drive Train Malfunction light on the dashboard lit up on two occasions which, combined with the persistent vibration and a new discovery that the Vehicle lacked power on acceleration, prompted Ms. Pyskaty to return to the service center.

43. On January 20, 2014 Open Road BMW advised Ms. Pyskaty that the engine had a defective solenoid valve, which may affect engine performance, and further advised that the part should be replaced.

44. After having that work done in January, Ms. Pyskaty still continued to experience engine performance problems, vibration, and high oil consumption.

45. On one visit on January 29, 2014, however, the Open Road BMW service center did determine that that passenger side wheel rims were both bent.

46. Ms. Pyskaty, also learned from Open Road BMW that the Vehicle was actually consuming 2 quarts of oil every 1200 miles or so.

47. She was further advised, again, by that BMW certified service center, that such high consumption was normal for her Vehicle.

48. Plaintiff paid to have the rims fixed, hoping that would address the Vibration.

49. But after the rim repair, Plaintiff still experienced Vibration upon driving.

50. In addition, during this time, Ms. Pyskaty noticed that the door locks began to malfunction, periodically making it impossible for the driver to open the driver's side door from the inside of the Vehicle.

51. Finding that her local BMW service center, Open Road, would not assist her with the Vehicle under her BMW CPO warranty, Plaintiff then sought the assistance of another BMW service center, Paul Miller BMW in Wayne, NJ.

52. The history of oil consumption up to that point was, approximately as follows:

- 1 quart added at 49,000 miles

- 1 quart added at 49,700 miles

- 2 quarts added at 50670 miles

- 2 quarts added at 5100 miles

- 2 quarts added at 52695 miles

- 2 quarts added at 54020 miles

- 2 quarts added at 55300 miles

- 2 quarts added at 56700 miles

- 2 quarts added at 5700 miles

53. In April 2014, Paul Miller BMW noted that the high oil consumption was not normal and diagnosed the problem as being related to leaking valve seals and defective turbo chargers that needed to be replaced.

54. Paul Miller BMW made the repair, which resolved the oil consumption issue.

55. Plaintiff was advised at that time by Paul Miller's service center that the turbo charger repair might address the vibration.

56. Once again, however, and despite her car having been in for repairs for approximately three weeks, Plaintiff still experienced the vibration after this repair.

57. Plaintiff then purchased four new, high speed balanced tires and rims at a cost of approximately $1500, in order to rule out any issue with the rims and tires as the cause of the vibration.

58. This did not rectify the vehicle's vibration problem.

59. On May 30, 2014, Plaintiff brought the Vehicle back to Paul Miller BMW to address the continued vibration and a newly noted engine sluggishness when the vehicle was in reverse.

60. Plaintiff was advised by Paul Miller BMW that the service center should conduct a 4 wheel alignment using the original stock rims and tires that came with the Vehicle, but that this would not be covered under the warranty.

61. BMW, NA would not cover the alignment under the CPO warranty.

8

62. Plaintiff agreed to pay for the alignment in the hope that it might diagnose the source of the persistent and worsening vibration.

63. Once again, however, the service was in vain, as despite the alignment, the vehicle vibration continued to be a problem and had become so pronounced that Plaintiff could not sit comfortably in the driver's seat while operating the car.

64. Plaintiff reached out directly to BMW of North America ("BMW-NA") at this time to complain about the problems with the Vehicle and request that it assist her with return the vehicle and refunding the purchase price.

65. In Plaintiff's phone call with BMW-NA, a representative told her that she had to go back to the dealership where she purchased the Vehicle because BMW-NA could not assist her with the problems she was experiencing.

66. Plaintiff and her husband then reached out again to Defendant WWBMW.

67. After several phone calls in early June, plaintiff's husband received a response from Lawrence Bikles at the dealership who, on or about June 9, 2014, provided Mr. Pyskaty with a copy of the CPO Vehicle Inspection Checklist used to certify the Vehicle.

68. The Vehicle Inspection Checklist warranties several facts about the history and condition of the Vehicle including:

      i.   That the Source of the Vehicle was "BMW FS Off-Lease"

     ii.   That the Vehicle was enrolled in the CPO program on October 10, 2013;

   iii.   That the Vehicle had been inspected and it was determined that its parts and history meet BMW Guidelines and Standards;

   iv.   That it did not have a disqualifying Carfax or AutoCheck report; and

    v. That Dealership staff signed off on the inspection and approved it as a CPO vehicle on October 16, 2013.

69. The dealership's CPO checklist shows that the Vehicle was offered for sale as a CPO 6 days before Dealership staff signed off on and approved the Vehicle as a CPO.

70. The Vehicle Inspection Checklist further shows that the Dealership identified cracks in the left rear wheel and that the right front wheel rim was "bent" and "curbed."

71. A corresponding repair order from the Dealership, dated 10/10/13 -10/16/13, which the Pyskatys also received in June 2014, reveals that in the course of the CPO inspection and repair, the Dealership noted that the Left Front wheel was cracked, but opted only to replace the Left Rear wheel with a new one.

72. The corresponding repair order does not mention the bent rim of the right front wheel.

73. After receiving the CPO check list, the Pyskatys returned to the dealership and spoke with Manager Michael Trontz about the problems Ms. Pyskaty had been experiencing.

74. Plaintiff explained all of the problems described here and the inability of any BMW service centers to correct the vibration and indicated her desire to revoke acceptance of the vehicle and arrange for return, rescission, and refund.

75. Mr. Trontz stated at the time, that WWBMW would only be willing to take the vehicle back as a trade-in on another vehicle that Plaintiff would have to purchase from WWBMW.

76. Mr. Trontz further advised that WWBMW would now value the vehicle at only $35,000 and even then, only for purpose of trade-in.

77. As such an arrangement would leave Ms. Pyskaty with a balance of about $35,000 owed to BMW-BNA, she declined the offer.

78. Extremely frustrated by any service center's inability to fix the persistent engine problems and other defects with the Vehicle and with WWBMW's refusal to provide an adequate financial solution to the problem, Plaintiff became concerned that the Vehicle may have sustained some serious damage from an accident before she purchased it, despite the Carfax report she was shown in October 2013.

79. On June 12, 2014, therefore, Plaintiff obtained an AutoCheck history on the Vehicle.

80. The AutoCheck report revealed that on August 24, 2012, the Vehicle sustained a rear impact collision, and as reported by police in Rhode Island, the Vehicle was towed from the scene of the accident.

81. In the following weeks during July 2014, Plaintiff began to notice that the Vehicle lacked power or hesitated on acceleration, in addition to the persistent vibration on driving.

82. Another visit to Paul Miller BMW on July 14, 2014 revealed that all of the stock tires on the Vehicle were wearing unevenly, despite the 4 wheel alignment preformed on May 30, 2014.

83. Afterwards, Plaintiff began to notice later in the summer of 2014 that the Vehicle would intermittently lose power steering, despite the power steering fluid level being full.

84. Feeling both unsafe and uncomfortable driving the vehicle given its numerous defects, she took the Vehicle off the road at this time and has kept it garaged sinced that time.

85. Despite Plaintiff's counsel's efforts to negotiate an acceptable return of the vehicle with WWBMW, the Dealership declined to cooperate.

86. The Vehicle exhibits a plethora of traits that, although not apparent to the layperson, would unequivocally inform a BMW dealership such as WWBMW that the vehicle had been in a major accident; that body panels had been replaced; and that extensive non-factory re-painting had been performed.

87. For example, and without limitation, the paint on various areas of the Vehicle exhibits a finish thickness that exceeds the standard thickness of a factory finish and is occluded with visible sanding scratches and the upper surfaces of the Vehicle have a condition known in the industry as "orange peel", all indicative of aftermarket refinishing.

88. Moreover, the trunk lid is missing BMW identifying logos and badges that would appear on a factory installed lid the left fender has at least two visible imperfections known as "fish eye", the right rear door has excess paint and a roughness in finish known in the body work industry as "chicken skin" and another imperfection known as "run sag". These paint imperfections are all inconsistent with a BWM factory paint finish and indicate extensive repainting.

89. Given the nature of these numerous imperfections and other signs of repair, panel replacement, panel adjustment, and prior accident(s), and particularly in light of the fact that Pre-Owned By BMW vehicles are subject to an extensive, 187 point inspection, including a detailed "Body Condition, Fit, and Finish" inspection, it is clear that WWBMW knew that its representations to Ms. Pyskaty regarding the condition and history of the vehicle were materially false at the time it made them.

90. Moreover, given the numerous indicators apparent to a BMW dealer but not a lay person of the vehicle's past, it is clear that WWBMW knew that the service history and Carfax provided to Ms. Pyskaty were materially inaccurate, incomplete and false at the time provided.

91. WWBMW knew of the accident and the incompleteness and falseness of the Carfax history no later than October 16, 2013, when its technicians ostensibly reviewed the fit, condition, finish, and history of the Vehicle.

92. The true value of the Vehicle is that of a rebuilt wrecked vehicle with an abnormal vehicle history that is abnormal and detrimental to value.

93. Because of the defects set forth above, the vehicle is unsafe to drive and inoperable on public streets.

94. At the time the Vehicle was sold to Plaintiff for $51,195.00 it had, in light of the vehicle's undisclosed defects and history, an actual value of approximately $20,478.00

95. The current value of the vehicle is approximately $14, 865.00.

96. Plaintiff has expended approximately $3,000 of pocket in her attempts to have the vehicle's numerous problems diagnosed and rectified.

97. In addition, Defendants conduct has caused Ms. Pysatsky significant and compensable pain and suffering over an extended period of time in the form of: stress; anxiety; aggravation, fear for her safety; fear for the safety of family members and others riding in the vehicle, sleeplessness, and loss of peace of mind.

98. Because the vehicle is not safe or comfortable to drive, and because her $1030/month payments on the Vehicle make purchasing a replacement vehicle unaffordable,

Plaintiff has also been forced to share a single vehicle with her husband for their daily commute since garaging the Vehicle due to its numerous defects.

99. On those occasions when Plaintiff is not working but her husband is, Plaintiff and her two year old son are left without a vehicle due to the fact that the Vehicle is not safe and roadworthy.

**COUNT I**
**MOSS WARRANTY ACT ("MMCWA"), 15 U.S.C. §§ 2301 et seq:**
**Breach of Implied Warranty of Merchantability**

100.  Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

101.  Defendants are "suppliers" and/or "warrantors" within the meaning of the MMCWA.

102.  Ms. Pyskaty is a "consumer", as that term is defined in the MMCWA.

103.  The car sold to Ms. Pyskaty is a "consumer product" within the meaning of the MMCWA.

104.  There is no dispute resolution mechanism which applies to Ms. Pyskaty's warranty dispute.  In the alternative, Defendants have no dispute resolution mechanism which is enforceable under the MMCWA and/or Ms. Pyskaty's good-faith attempts to resolve her dispute with Defendants, all of which were rebuffed, constitute compliance with any reasonable dispute resolution requirement.

105.  An implied warranty that the car was merchantable arose by operation of law as part of the sale; and because the car was expressly warranted, in writing, Defendants were unable to disclaim any implied warranties as a matter of law.

106.  Section 2310(d) of the Magnuson-Moss Warranty Act provides, in relevant part:

14

a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief— (A) in any court of competent jurisdiction[.]

107.   At all relevant times, Defendant WWBMW was a retail merchant with respect to the goods sold to Plaintiff.

108.   In selling the Vehicle to Plaintiff, WWBMW warranted that the Vehicle was of a quality which would at least pass without objection in the trade, was of fair, average quality within the description, and was at least fit for ordinary purposes for which the Vehicle was sold.

109.   In purchasing the Vehicle the vehicle, Plaintiff relied upon WWBMW's said warranty of merchantability, as well as upon representations and statements constituting express warranties which were made by Defendant.

110.   As set forth in detail above, the Vehicle was not of merchantable quality and was not suitable for ordinary purposes.

111.   Indeed, the vehicle is unsafe to operate, as has been confirmed by a third-party automotive expert after inspection of the Vehicle.

112.   Because the Vehicle was not of merchantable quality when sold in that, *inter alia*, it was not fit for the ordinary purposes for which such goods are used, and would not pass in trade under the contract description, and because it cannot be put into merchantable quality, Defendants breached the implied warranty of merchantability.

113.   Plaintiff notified Defendants that she wished to rescind the sale.

114.   As set forth above, Defendants have refused to accept the return of the vehicle and has refused to refund to Plaintiff the purchase price or any other amount.

115.    As a result of the breach of implied warranty of merchantability, Ms. Pyskaty has

suffered actual damages.

116.    Defendants' breach of implied warranty of merchantability constitutes a violation

of 15 U.S. C. § 2310(d).

117.    As a result of these violations, pursuant to MMWA § 2310(d), Plaintiff is entitled

to actual damages, declaratory judgment that Defendant's practices violate the

MMWA, and reasonable attorney's fees, costs and expenses.

118.    Plaintiff is entitled to and reserves the right, at her discretion, to elect cancellation

and rescission of the loan in lieu of those actual damages attributable to the vehicle's

diminished value.

**COUNT II**
**MAGNUSON MOSS WARRANTY ACT ("MMCWA"), 15 U.S.C. §§ 2301 *et seq*:**
**Breach of Express Written Warranty**

119.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing

paragraphs.

120.    The Defendants created a written warranty under their advertised CPO program

that provides a written affirmation of fact related to the condition of the vehicle and

the nature and quality of the workmanship of its technicians and participating

dealerships and as such created a written warranty under 15 U.S.C. § 2301(6).

121.    As the Vehicle sold to Ms. Pyskaty suffers from significant defects in its

condition and as the Vehicle was not properly serviced and/or repaired in compliance

with the BMW CPO requirements prior to sale, as described above, Defendants have

breached the written warranty.

122.    As a result of this breach, Ms. Pyskaty has suffered actual damages

123.    Defendants' breach of express warranty constitutes a violation of 15 U.S. C. §
2310(d).

124.    As a result of these violations, pursuant to MMWA § 2310(d), Plaintiff is entitled
to actual damages, declaratory judgment that Defendant's practices violate the
MMWA, and reasonable attorney's fees, costs and expenses.

125.    Plaintiff is entitled to and reserves the right, at her discretion, to elect cancellation
and rescission of the loan in lieu of the actual damages attributable to the vehicle's
diminished value.

## COUNT III
## BREACH OF EXPRESS WARRANTY UNDER NY UCC § 2-313

126.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing
paragraphs.

127.    Those facts supporting Plaintiff's claim for breach of express written warranty
under the MAGNUSON Moss Consumer Warranty Act, set forth above, constitute
breach of express warranty under NY UCC § 2-313.

128.    In addition, Defendants breached express oral warranties in violation of NY UCC
§ 2-313.

129.    Specifically, and without limitation, Ms. Pyskaty explicitly stated prior to her
purchase of the Vehicle that she required a vehicle with no accidents.

130.    Defendants explicitly represented that the vehicle had suffered no accidents, and
as such created an Express Warranty under NY UCC § 2-313.

131.    The vehicle contained a gross defect in that its actual condition and its accident
and service history were inconsistent with the oral representations made by the
Dealership.

132.    As such, and because no repair could rectify the inconsistency, Ms. Pyskaty was entitled to return or replace the vehicle at no additional cost to her but was not permitted to do so.

133.    As a result of this breach of an Express Warranty, Ms. Pyskaty is entitled to actual damages, declaratory judgment, and reasonable attorney's fees, costs and expenses.

134.    Plaintiff is entitled to and reserves the right, at her discretion, to elect cancellation and rescission of the loan in lieu of those actual damages attributable to the vehicle's diminished value.

### COUNT IV
### NYUCC § 2-314
### IMPLIED WARRANT OF MERCHANTABILITY

135.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

136.    Those facts supporting Plaintiff's claim for breach of express written warranty under the MAGNUSON Moss Consumer Warranty Act, set forth above, constitute breach of the implied warranty of merchantability under NY UCC § 2-314.

137.    As a result of this breach of an implied warranty of merchantability, Ms. Pyskaty is entitled to actual damages, declaratory judgment, and reasonable attorney's fees, costs and expenses.

138.    Plaintiff is entitled to and reserves the right, at her discretion, to elect cancellation and rescission of the loan in lieu of those actual damages attributable to the vehicle's diminished value.

## COUNT V
## FRAUD

139.   Plaintiff repeats and re-alleges and incorporates by reference the foregoing

paragraphs.

140.   Defendants' made intentional, material misrepresentations and omissions

regarding the condition and accident history of the Vehicle.

141.   Specifically, as detailed above, WWBMW explicitly represented that the vehicle

had never been in an accident.

142.   In addition, WWBMW represention that the Carfax report disclosed on-line and at

the dealership to Ms. Pyskaty was true, accurate and complete, when the Vehicle

contained signs of accident damage that were obvious to a trained technician though

not so to a lay person, was also intentionally and materially deceptive.

143.   Ms. Pyskaty justifiably relied upon each of the aforesaid misrepresentations of

material facts, individually and collectively, as a result of which she sustained losses

and damages.

144.   Had Ms. Pyskaty known the true value of the car (approximately $20, 478.00 at

the time she purchased it for $51,195.00), she would not have agreed to purchase the

vehicle.

145.   Ms. Pyskaty's actual damages include but are not limited to the decreased value

of the vehicle and out of pocket repair costs, as well as pain and suffering in the form

of stress; anxiety; aggravation, fear for her safety; fear for the safety of family

members and others riding in the vehicle, sleepless, and loss of peace of mind.

146.   Because WWBMW's fraudulent conduct was willful, malicious and calculated, Ms. Pyskaty is also entitled to punitive damages of not less than three times her actual damages, as well as costs.

## COUNT VI
## NYGBL § 349 (DECEPTIVE ACTS AND PRACTICES UNLAWFUL)

147.   Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

148.   Each of the deceptive acts and practices set forth above, constitute violations of NYGBL § 349 independent of whether these acts and practices constitute violations of any other law, including common law.

149.   These deceptive acts and practices were committed in conduct of business, trade, commerce or the furnishing of a service in this state.

150.   Defendants' deceptive acts and practices were consumer-orientated.

151.   Defendants' conduct was not a unique, one-time occurrence without possibility of replication or recurrence and without implication for the broader consuming public.

152.   Rather, upon information and belief, WWBMW, as it did to Plaintiff here, regularly induces consumers to rely on Carfax reports when they know that the reports are false and inaccurate based on their own expert knowledge, inspection and handling of the vehicles being sold.

153.   The deceptive conduct of which Plaintiff is a victim is highly capable of repetition and is can be used against any other consumer attempting to buy a certified used vehicle from Defendants.

154. Indeed, on information and belief, Defendants' willfully and knowingly engage in the deceptive tactics set forth herein, in bad faith, on a regular and recurring basis.

155. Defendants' conduct and statements were materially misleading.

156. As a result of these violations of NYGBL §349, Ms. Pyskaty suffered actual damages.

157. For these reasons, Ms. Pyskaty is entitled to actual damages, an injunction of the deceptive practices set forth herein, three times actual damages up to $1000, punitive damages, costs and reasonable attorneys' fees.

## COUNT VII
## NYGBL § 350 (UNLAWFUL FALSE ADVERTISING)

158. Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

159. WWMBA's false representations to Ms. Pyskaty, both orally and in writing, regarding the condition and history of the vehicle, set forth above, constitute violations of NYGBL § 350 independent of whether these representations violated any other state or federal law or gave rise to any other common law violation.

160. With regard to false written representations, Plaintiff refers, *inter alia*, to the Carfax provided to Plaintiff which Defendant knew at the time to be false and inaccurate.

161. These oral and verbal misrepresentations, which were made prior to sale of the vehicle and for the purpose of inducing Plaintiff to go ahead with the purchase, constitute false advertising pursuant to NYGLB § 350, which defines "false advertising" to mean:

advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity . . . to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

162. Defendants' false advertising was committed in the conduct of business, trade, commerce or the furnishing of a service in this state.

163. Defendants' false advertising was done knowingly and willfully and committed in bad faith.

164. As a result of these violations of NYGBL §350, Plaintiff suffered actual damages.

165. For these reasons, Plaintiff is entitled to injunctive relief (enjoining the false advertising practices described above), actual damages, three times the actual damages up to $10,000, punitive damages, costs and reasonable attorney's fees.

WHEREFORE Ms. Pyskaty respectfully demands an arbitration award against Defendants as follows:

a. On COUNT I, MAGNUSON MOSS WARRANTY ACT ("MMCWA"), 15 U.S.C. §§ 2301 et seq (Breach of Implied Warranty), "), judgment against all Defendants, actual damages (or, with regard to the vehicle's diminished value, in the alternative, cancellation and rescission), reasonable attorney's fees, costs and expenses, and declaratory judgment that Defendants have violated the MMWA;

b. On COUNT II, MAGNUSON MOSS WARRANTY ACT ("MMCWA"), 15 U.S.C. §§ 2301 et seq (Breach of Express Warranty), judgment against all Defendants, actual damages (or, with regard to the vehicle's diminished value, in the alternative,

cancellation and rescission), reasonable attorney's fees, costs and expenses, and declaratory judgment that Defendants have violated the MMWA;

c.  On COUNT III, BREACH OF EXPRESS WARRANTIES (NYUCC § 2-313); judgment against all Defendants, actual damages, punitive damages, attorney's fees, costs and expenses;

d.  On COUNT IV, BREACH OF IMPLIED WARRANTIES (NYUCC § 2-314), judgment against all Defendants, actual damages, punitive damages, attorney's fees, costs and expenses;

e.  On COUNT V, FRAUD, judgment against all Defendants, actual and punitive damages, costs and expenses;

f.  On COUNT VI, NYGBL § 349 (Deceptive Acts and Practices Unlawful) judgment against all Defendants, actual damages, three times the actual damages up to $1000, punitive damages, declaratory judgment that Defendants' acts and practices are deceptive, injunctive relief (enjoining the deceptive practices described above) costs and attorney's fees.

g.  On COUNT IV, NYGBL § 350, judgment against all Defendants, actual damages, three times the actual damages up to $10,000, punitive damages, declaratory judgment that Defendants' acts and practices are deceptive, injunctive relief (enjoining the false advertising practices described above), costs and attorney's fees.

h.  Together with such other relief as law and equity may provide, punitive damages, declaratory judgment, attorneys' fees, costs and disbursements of this action and such other and further relief as this forum deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues

so triable.

Dated February 27, 2015

Respectfully submitted,

Daniel A. Schlanger, Esq.
Schlanger & Schlanger, LLP
343 Manville Road
Pleasantville, NY 10570
T: 914-946-1981
F: 914-946-2930
daniel.schlanger@schlangerlegal.com