**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| Maya Pyskaty, | ) | |
| Plaintiff, | ) | |
| v. | ) | No.  15-cv-1600 (JCM) |
| Wide World of Cars, LLC, and | ) | |
| BMW Bank of North America, | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT**
**WIDE WORLD OF CARS, LLC'S MOTION TO DISMISS**

October 1, 2015

Daniel A. Schlanger, Esq.
Schlanger & Schlanger, LLP
343 Manville Road
Pleasantville, NY 10570
T. (914) 946-1981, ext. 101/F. (914) 946-2930
daniel.schlanger@schlangerlegal.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ........................................................................... 1

II.  FACTS AND PROCEDURAL POSTURE ...................................................... 2

III. LEGAL ARGUMENT ..................................................................................... 8

   A. Applicable Legal Standards Regarding Jurisdictional Motions ...................................... 8

   B. Plaintiffs' Claims, In The Aggregate, Exceed The MMWA's $50,000 Amount In

   Controversy Requirement ..................................................................................... 10

      1. *The Statute Is Unambiguous* ....................................................................... 10

      2. *Plaintiff's Complaint Alleges More Than $50,000 In Damages* ............................... 12

   C. Revocation Is Available To Plaintiff .................................................................... 14

   D. The Rescission Amount Is Greater Than $50,000 .................................................... 15

   E. Plaintiff's Federal Claim, Standing Alone, Exceeds $50,000 ....................................... 16

   F. There Are Multiple Written Warranties Applicable To This Transaction And, As A

   Result, Any Attempt To Disclaim Implied Warranties is Prohibited ................................... 17

      1. *Warranties Attached To WWC's Own Papers* ..................................................... 17

      2. *The CPO Warranty* ................................................................................... 18

   G. Defendant's Other Arguments ............................................................................ 21

      1. *Reasonable Opportunity to "Repair"* ............................................................. 21

      2. *"Disclaimer of Warranties" That Does Not Disclaim Warranties* ............................. 22

      3. *"Vehicle History Disclaimer and Release"* ...................................................... 24

IV.  CONCLUSION ............................................................................................. 26

Plaintiff Maya Pyskaty, by and through her counsel, Schlanger & Schlanger, LLP, respectfully submits this memorandum in opposition to Defendant Wide World of Cars, LLC's motion to dismiss.  For the reasons set forth below, Plaintiff respectfully submits that Defendant's motion is without merit and should be denied.

## I.   PRELIMINARY STATEMENT

Plaintiff Maya Pyskaty is an individual consumer who brings suit against an auto dealership, Wide World of Cars, LLC d/b/a Wide World BMW ("WWC" or "the dealer") and its assignee, BMW Bank of North America ("BMW Bank") regarding a range of deceptive and unlawful conduct in connection with her purchase in late October 2013 of a certified, pre-owned 2010 BMW 750LXI luxury automobile ("the Vehicle"). First Amended Complaint ("FAC") (*ECF Doc. 17*), at ¶¶ 1-2, 13.

Defendant Wide World of Cars, LLC d/b/a Wide World BMW ("WWC" or "the dealer") argues that this Court lacks jurisdiction pursuant to the Magnuson Moss Warranty Act, 15 U.S.C. § 2310(d)(3), on grounds that  the aggregate of Plaintiff's claims does not meet the MMWA's $50,000 amount in controversy threshold.[1]

In doing so, WWC makes a hodge podge of arguments – some made in its memorandum of law, others improperly asserted in opposing counsel's affidavit -- that are not only at odds with the allegations in Plaintiff's complaint and applicable law, but are in many cases flatly contradicted by the documents WWC has attempted to introduce in support of its position.

For the reasons set forth below, WWC's arguments are without merit and its motion should be dismissed.

---

[1] Plaintiff concedes the issue of diversity jurisdiction, as Defendant WWC has provided evidence that one of the principles of the company is, like Ms. Pyskaty, a New Jersey resident.

## II.  FACTS AND PROCEDURAL POSTURE

Ms. Pyskaty travelled to the WWC's auto lot with her husband, seeking a certified pre-owned ("CPO") BMW for Ms. Pyskaty's personal, non-commercial use.  *FAC* at ¶¶ 13-14.

After being informed that the CPO vehicle that Mr. Pyskaty had seen advertised was no longer available, they looked at a second vehicle, which they were informed could be certificatied for an additional $2,000 - $3,000.  Because the second vehicle was offered on terms less favorable than those advertised on WWC's website, Plaintiff declined to purchase it.  *Id*. at ¶¶ 13-19.

Plaintiff ultimately became interested in a third vehicle (i.e. the Vehicle at issue in this litigation) which was being offered as a "certified pre-owned" BMW.  *Id*. at 20.

As set forth in the FAC:

21.   Ms. Pyskaty also asked the salesperson, Moon Hasan, about the history of the Vehicle and physical condition.  She specifically asked if the Vehicle had been in an accident.

22.   Mr. Hasan responded that the Vehicle had no accident history, was "perfect" and had a "clean" Carfax.

23.   Mr. Hasan further stated that both he and a manager named "Joey" had been driving the car and had both determined that it was a good car.

24.   In addition, to further convince Ms. Pyskaty that the Vehicle had no accident history, the salesperson provided Ms. Pyskaty with what purported to be a clean Carfax report, dated October 31, 2013.

25.   The sales person also confirmed that the Vehicle was a CPO and had passed the inspection requirement for BMW CPO's.

26.   The "Carfax" report also confirms that the Vehicle was put up for sale as a CPO on October 10, 2013.

27.   Relying on these representations, Ms. Pyskaty agreed to purchase the Vehicle for $51,195, which included a premium for the CPO Certification.

Within the first week of owning the vehicle, Ms. Pyskaty experienced vehicle vibrations and contacted the dealership.  *Id*. at ¶¶ 29-30.

The dealership told Plaintiff, through her husband, that the vibration was normal and would go away.  *Id*. at ¶ 31.

2

When the vibration did not go away over the course of the next few weeks, and noticing the vehicle consumed excessive amounts of oil, Plaintiff took the vehicle to a local BMW dealer (not WWC), and was told that BMW-BNA did not authorize any repair, and instead she should monitor the vehicle's oil consumption, and that the service center's tightening of the suspension should address the vibration issue. *Id*. at ¶¶ 32-37.

Over the next several months (into January 2014), and in light of continuation of the existing problems (including vehicle vibration), and emergence of new problems, such as lack of power on acceleration, brought the vehicle back to a local BMW dealership repeatedly, to no avail. *Id*. at ¶¶ 39-46.

The local dealership determined that "the passenger side wheel rims were both bent". *Id*. at ¶ 45.

Plaintiff paid to have the rims fixed, but the vibration continued. *Id*. at ¶¶ 48-49.

During this time period, "Ms. Pyskaty noticed that the door locks began to malfunction, periodically making it impossible for the driver to open the driver's side door from the inside of the Vehicle." *Id.* at ¶ 50.

Eventually, Ms. Pyskaty took the Vehicle to another BMW service center, where the excessive oil consumption was addressed. However, despite additional repairs aimed at fixing the problem, the vehicle vibration issue continued. *Id*. at ¶¶ 53-56.

Attempting to fix the problem, Plaintiff purchased new tires and rims, but the problem continued unabated. *Id*. at ¶¶ 57-58.

After BMW Bank refused to cover having an alignment (with the original stock tires and rims) under the warranty, Plaintiff then paid for additional work (alignment) to attempt to repair the vibration. This work did not resolve the vibration issue, which "had become so

3

pronounced that Plaintiff could not sit comfortably in the driver's seat while operating the

car." *Id*. at 59-63.

Plaintiff was instructed by BMW-NA "to go back to the dealership where she

purchased the Vehicle because BMW-NA could not assist her with the problems she was

experiencing." *Id*. at 65.

As set forth in detail in the FAC:

67. After several phone calls in early June, plaintiff's husband received a response from Lawrence Bikles at the dealership who, on or about June 9, 2014, provided Mr. Pyskaty with a copy of the CPO Vehicle Inspection Checklist used to certify the Vehicle.

68. The Vehicle Inspection Checklist warranties several facts about the history and condition of the Vehicle including:
    i.    That the Source of the Vehicle was "BMW FS Off-Lease"
    ii.   That the Vehicle was enrolled in the CPO program on October 10, 2013;
    iii.  That the Vehicle had been inspected and it was determined that its parts and history meet BMW Guidelines and Standards;
    iv.   That it did not have a disqualifying Carfax or AutoCheck report; and
    v.    That Dealership staff signed off on the inspection and approved it as a CPO vehicle on October 16, 2013.

69. The dealership's CPO checklist shows that the Vehicle was offered for sale as a CPO 6 days before Dealership staff signed off on and approved the Vehicle as a CPO.

70. The Vehicle Inspection Checklist further shows that the Dealership identified cracks in the left rear wheel and that the right front wheel rim was "bent" and "curbed."

71. A corresponding repair order from the Dealership, dated 10/10/13 - 10/16/13, which the Pyskatys also received in June 2014, reveals that in the course of the CPO inspection and repair, the Dealership noted that the Left Front wheel was cracked, but opted only to replace the Left Rear wheel with a new one.

72. The corresponding repair order does not mention the bent rim of the right front wheel.

73. After receiving the CPO check list, the Pyskatys returned to the dealership and spoke with Manager Michael Trontz about the problems Ms. Pyskaty had been experiencing.

74. Plaintiff explained all of the problems described here and the inability of any BMW service centers to correct the vibration and indicated her desire to revoke acceptance of the vehicle and arrange for return, rescission, and refund.

4

75.     Mr. Trontz stated at the time, that WWBMW would only be willing to take the vehicle back as a trade-in on another vehicle that Plaintiff would have to purchase from WWBMW.

76.     Mr. Trontz further advised that WWBMW would now value the vehicle at only $35,000 and even then, only for purpose of trade-in.

77.     As such an arrangement would leave Ms. Pyskaty with a balance of about $35,000 owed to BMW-BNA, she declined the offer.

78.     Extremely frustrated by any service center's inability to fix the persistent engine problems and other defects with the Vehicle and with WWBMW's refusal to provide an adequate financial solution to the problem, Plaintiff became concerned that the Vehicle may have sustained some serious damage from an accident before she purchased it, despite the Carfax report she was shown in October 2013.

79.     On June 12, 2014, therefore, Plaintiff obtained an AutoCheck history on the Vehicle.

80.     The AutoCheck report revealed that on August 24, 2012, the Vehicle sustained a rear impact collision, and as reported by police in Rhode Island, the Vehicle was towed from the scene of the accident.

In July 2014, Plaintiff continued to experience continued persistent vibration, and noticed additional problems, including lack of power and acceleration, and uneven tire wear despite alignment. *Id.* at ¶ 81-82.

Later in July 2014, Plaintiff experienced intermittent loss of power steering despite the power steering fluid level being full. *Id.* at 83.

"Feeling both unsafe and uncomfortable driving the vehicle given its numerous defects, she took the Vehicle off the road and has kept it garaged since that time [i.e. since late summer 2014]. *Id.* at ¶ 84 [brackets added].

Counsel for Plaintiff subsequently attempted to negotiate return of the vehicle with WWC, but "the Dealership declined to cooperate." *Id.* at ¶ 85.

Plaintiff had the vehicle inspected by a third party expert.  As detailed in the Amended Complaint (see, e.g. *id.* at 87-89), as well as the expert report submitted herewith as *Exhibit A* to the Declaration of Daniel A. Schlanger, Esq. ("Schlanger Decl."), "[t]he Vehicle exhibits a plethora of traits that, although not apparent to the layperson, would unequivocally inform a

BMW dealership such as WWBMW that the vehicle had been in a major accident; that body

panels had been replaced; and that extensive non-factory re-painting had been performed."

*FAC* at ¶ 86.

As further set forth in the FAC,

> 89. Given the nature of these numerous imperfections and other signs of repair, panel replacement, panel adjustment, and prior accident(s), and particularly in light of the fact that Pre-Owned By BMW vehicles are subject to an extensive, 187 point inspection, including a detailed "Body Condition, Fit, and Finish" inspection, it is clear that WWBMW knew that its representations to Ms. Pyskaty regarding the condition and history of the vehicle were materially false at the time it made them.
>
> 90. Moreover, given the numerous indicators apparent to a BMW dealer but not a lay person of the vehicle's past, it is clear that [WWC] knew that the service history and Carfax provided to Ms. Pyskaty were materially inaccurate, incomplete and false at the time provided.
>
> 91. [WWC] knew of the accident and the incompleteness and falseness of the Carfax history no later than October 16, 2013, when its technicians ostensibly reviewed the fit, condition, finish, and history of the Vehicle.
>
> 92. The true value of the Vehicle is that of a rebuilt wrecked vehicle with a vehicle history that is abnormal and detrimental to value.
>
> 93. Because of the defects set forth above, the vehicle is unsafe to drive and inoperable on public streets.

With regard to the specifics of Plaintiff's actual damages, the FAC alleges

several categories in its fact section, including:

> i. diminished value "in light of the vehicle's undisclosed defects and history" (of approximately $30,717 at the time of sale to Ms. Pyskaty, and $36,330 at the time of suit) (*FAC* at 94-95);
>
> ii. out of pocket damages for repairs of "approximately $3,000" (*Id.* at 96);
>
> iii. "significant and compensable pain and suffering over an extended period of time in the form of: stress; anxiety; aggravation, fear for her safety; fear for the safety of family members and others riding in the vehicle, sleeplessness, and loss of peace of mind." (*Id.* at 97).
>
> iv. Out of pocket expenses associated with continued payments of "$1030/month" on a vehicle that has been garaged since summer 2014.

6

> *Id*. at 84, 98, i.e. additional out of pocket expenses totaling some
> $8,240.00 at the time of filing (8 months x 1030/mo), as well as
> insurance expenses associated with the continued ownership of the
> undriveable vehicle during this period.

Ms. Pyskaty filed suit on March 9, 2015, alleging violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 2301 et seq., New York General Business Law § 349, New York General Business Law § 350; New York Uniform Commercial Code § 2-313 (breach of express warranty), and New York Uniform Commercial Code § 2-314 (breach of implied warranty of merchantability and Fraud.

The Complaint was – after consultation with the Court and on consent of WWC-- amended as of right to address a scrivener's error in the wherefore clause, and the amended/corrected complaint was filed on August 21, 2015.

Plaintiff's warranty federal and state warranty claims seek money damages or, in the alternative, rescission of the purchase of the vehicle.  *FAC* at ¶¶ 117-118, 124-125, 133-134, 137-138.

Plaintiff's claim under § 349 seeks "actual damages, an injunction of the deceptive practices set forth herein, three times actual damages up to $1000, punitive damages, costs and reasonable attorneys' fees."  *Id*. at ¶ 157.

Plaintiff's claim § 350 under injunctive relief seeks (enjoining the false advertising practices described above), actual damages, three times the actual damages up to $10,000, punitive damages, costs and reasonable attorney's fees.).  See, *FAC* at ¶ 165.

Plaintiff's claim for fraud seeks actual and punitive damages, costs and expenses.  With regard to punitives, the FAC states, *inter alia*, that "[b]ecause WWBMW's fraudulent conduct

was willful, malicious and calculated, Ms. Pyskaty is also entitled to punitive damages of not

less than three times her actual damages, as well as costs." *Id.* at ¶ 146.

The parties consented to referral to a U.S. Magistrate for all purposes by stipulation.

*ECF Doc. 7.*   WWC's motion followed.

## III.   LEGAL ARGUMENT

### A.  Applicable Legal Standards Regarding Jurisdictional Motions

*1.  Determination Of The Amount In Controversy*

Oddly, Defendant's motion does not discuss any of the relevant Second Circuit

authority with regard to the standards applicable to determination of amounts in controversy.

As the Second Circuit has stated:

> The test for determining whether a plaintiff has met the statutory
> jurisdictional amount was established by the Supreme Court in *St. Paul
> Mercury*. In that case, the Court stated that:
>
> > The rule governing dismissal for want of jurisdiction in
> > cases brought in the federal court is that, unless the law
> > gives a different rule, the sum claimed by the plaintiff
> > controls if the claim is apparently made in good faith. It
> > must appear to a legal certainty that the claim is really for
> > less than the jurisdictional amount to justify dismissal.
>
> *St. Paul Mercury*, 303 U.S. at 288-89 (footnotes omitted). The fact that a
> plaintiff may not recover the minimum jurisdictional amount, or that a
> valid defense to the claim may exist, "does not show [the plaintiff's] bad
> faith or oust the jurisdiction." Id. at 289 (footnote omitted). However,
>
> > if, from the face of the pleadings, it is apparent, to a legal
> > certainty, that the plaintiff cannot recover the amount
> > claimed, or if, from the proofs, the court is satisfied to a
> > like certainty that the plaintiff never was entitled to recover
> > that amount, and that his claim was therefore colorable for
> > the purpose of conferring jurisdiction, the suit will be
> > dismissed.
>
> *Id*. (footnote omitted). This rule was reaffirmed in *Horton v.
> Liberty Mutual Insurance Co.*, 367 U.S. 348, 353, 6 L. Ed. 2d 890,

> 81 S. Ct. 1570 (1961) (the amount in controversy is to be
> determined from the complaint itself, and, absent a showing that
> the amount claimed was not sought "in good faith," it '"must
> appear to a legal certainty that the claim is really for less than the
> jurisdictional amount to justify dismissal.'") (quoting *St. Paul
> Mercury*, 303 U.S. at 289) (footnote omitted).

*Tongkook Am. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994).

*Tongkook* went on to note that "the 'good faith' test, is but a 'linguistic variant' of the

second *St. Paul Mercury* test -- the "legal certainty" standard, and that – in order to deny

jurisdiction, "the legal impossibility of recovery must be so certain as virtually to negative the

plaintiff's good faith in asserting the claim.  *Id*. (citations omitted).

784 (2d Cir. 1994).  See *id*. at 786.  ("If the right of recovery is uncertain, the doubt should be

resolved . . .  [786]  in favor of the subjective good faith of the plaintiff.") (quoting *McDonald

v. Patton*, 240 F.2d 424, 426 (4th Cir. 1957).

Put differently, as the Second Circuit held in *Scherer v. Equitable Life Assur. Soc'y of the

United States*, 347 F.3d 394, 397(2d Cir. 2003), although:

> '[a] party invoking the jurisdiction of the federal court has the burden of proving
> that it appears to a 'reasonable probability' that the claim is in excess of the
> statutory jurisdictional amount.' *Tongkook Am., Inc. v. Shipton Sportswear Co.*,
> 14 F.3d 781, 784 (2d Cir. 1994) (quoting *Moore v. Betit*, 511 F.2d 1004, 1006 (2d
> Cir. 1975)). This burden is hardly onerous, however, for we recognize "a
> rebuttable presumption that the face of the complaint is a good faith
> representation of the actual amount in controversy.*" Wolde-Meskel v. Vocational
> Instruction Project Cmty. Servs., Inc.*, 166 F.3d 59, 63 (2d Cir. 1999).
>         To overcome the face-of-the-complaint presumption, the party opposing
> jurisdiction must show "to a legal certainty" that the amount recoverable does not
> meet the jurisdictional threshold. *Id*. (quoting *St. Paul Mercury Indem. Co. v. Red
> Cab Co.*, 303 U.S. 283, 288-289, 82 L. Ed. 845, 58 S. Ct. 586 (1938)). Our cases
> have set a high bar for overcoming this presumption. "[T]he legal impossibility of
> recovery must be so certain as virtually to negative the plaintiff's good faith in
> asserting the claim." *Chase Manhattan Bank, N.A. v. Am. Nat. Bank and Trust Co.
> of Chicago*, 93 F.3d 1064, 1070-71 (2d Cir. 1996) (quoting Tongkook, 14 F.3d at
> 785). "[E]ven where [the] allegations leave grave doubt about the likelihood of a
> recovery of the requisite amount, dismissal is not warranted." *Zacharia v. Harbor
> Island Spa, Inc.,* 684 F.2d 199, 202 (2d Cir. 1982); see also *Tongkoo*k, 14 F.3d at

9

785 ("Where the damages sought are uncertain, the doubt should be resolved in favor of the plaintiff's pleadings.")

*Id.* at 397.

2. *Going Beyond The Pleadings*

Unlike a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim  or a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), the Court may – but is not required to – consider evidence outside the pleadings when considering a motion to dismiss made pursuant to Fed. R. Civ. P. 12(b)(1), may refer to evidence outside the pleadings. *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)); *J.S. ex rel. N.S. v. Attica Central Schools*, 386 F.3d 107, 110 (2d Cir. 2004) (noting that the district court opted not to consider evidence outside the pleadings and following suit).[2]

### B.  Plaintiffs' Claims, In The Aggregate, Exceed The MMWA's $50,000 Amount In Controversy Requirement

1. *The Statute Is Unambiguous*

---

[2] Although Plaintiff does not believe that reference to outside materials is necessary in the case at bar, particularly given the detailed nature of the (165 paragraph) complaint, Plaintiff accepts that the court has discretion to refer to such materials in making a jurisdictional determination and therefore (a) refers throughout the instant memoranda to the exhibits submitted by Defendant, and (b) attached and refers to additional documentary evidence that rebuts various assertions made by WWC in its motion papers.  By doing so, Plaintiff does not anticipate or consent to the conversion of the instant motion to one for summary judgment.

Plaintiff also notes that while going outside the pleadings is appropriate in 12(b)(1) motions, it is generally not appropriate in 12(b)(6) motions.  Yet, Defendant goes outside the pleadings when he makes 12(b)(6) arguments, allowing  Defendant to impermissibly use its 12(b)(1) motion to "piggy-back" its 12(b)(6) attacks and to rely on various extraneous materials in doing so.

In addition to not consenting to treating Defendant's motion as one for summary judgment, Plaintiff objects to Defendants' repeated reliance upon extraneous materials in support of what, in essence, are 12(b)(6) arguments.  *Standard Investment Chartered, Inc. v. National Ass'n of Securities Dealers, Inc.*, 621 F.Supp.2d 55, 67, n.7 (S.D.N.Y. 2007) (noting the different standards with regard to documents outside the pleadings pursuant to Fed. R. Civ. P. 12(b)(1) vs. 12(b)(6), and declining to consider extraneous documents in connection with a party's 12(b)(6) (as opposed to its 12(b)(1)) motion lest – as here – a party be permitted to "take unfair advantage of the common practice of making multiple Rule 12 motions in the same document.").

The MMWA states, in relevant part,

> No claim shall be cognizable in a suite brought under paragraph (1)(B) of this subsection—
> ***
> (B) if the amount in controversy is less than the sum or value of $50,00 (exclusive of interests and costs) *computed on the basis of all claims to be determined in this suit*.

15 U.S.C. §2310(d)(3) (emphasis added).

The relevant language ("all claims") is not ambiguous, and not susceptible to interpretation. *Black's Law Dictionary*, at 74 (6th ed. 1990) ("all" means "each one of."). Indeed, this plain reading would be consistent with the remedial nature of the Magnuson-Moss Warranty Act, which, after all, is a remedial consumer protection statute. Report of the Committee on Interstate and Foreign Commerce, 1974 U.S.C.C.A.N. 7702-42.

Indeed, the legislative history of the Act refers to the "*overall* matter in controversy" as exceeding $50,000, giving additional support that all claims can, and should, be aggregated in determining jurisdiction. *Id*. (emphasis added.) *See, Harnden v. Jayco, Inc.*, 496 F.3d 579, 582 (6th Cir. 2007) ("We may consider this state-law claim in computing whether the amount-in-controversy requirement is met. *See* 15 U.S.C. § 2310(d)(3)(B) (expressly providing that federal jurisdiction is not proper "if the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs) *computed on the basis of all claims to be determined in this suit*") (emphasis added).").

As one District Court recently stated, citing the 6th Circuit's ruling on point in *Harnden*:

> "Magnuson-Moss states that the amount in controversy is to be "computed on the basis of all claims to be determined in this suit." 15 U.S.C. § 2310(d)(3)(B). Accordingly, state law claims are included. *Harnden v. Jayco, Inc.*, 496 F.3d 579, 583 (6th Cir. 2007); *Carver v. Gen. Motors LLC*, No. 3:10-1096, 2011 U.S. Dist. LEXIS 17906, 2011 WL 734985, at *2 (M.D. Tenn. Feb. 23,

> 2011)(including treble damages under the [Tennessee Consumer Protection Act] in calculating that plaintiff's claims exceeded Magnuson-Moss's amount in controversy requirement). When trebling the purchase price of his car, without offsets, Dodd claims that the amount in controversy easily exceeds Magnuson-Moss's $50,000 jurisdictional minimum.

*Dodd v. Chrysler Group LLC*, 2012 U.S. Dist. LEXIS 60428, *28, 2012 WL 1565640 (W.D. Tenn. May 1, 2012).  See *Sender v. Daimlerchrysler Motors Corp.*, 1999 U.S. Dist. LEXIS 16500, *2 (N.D. Ill. Oct. 19, 1999) ("the reference in (3)(B) to computing "on the basis of all claims to be determined in this suit" means that  state law claims made by a consumer may be aggregated with that consumer's Magnuson-Moss claim(s) for purposes of determining the amount in controversy.").

Admittedly, notwithstanding the statutory text, several appellate courts either have held, or stated in *dicta*, that state law claims may not be aggregated for reaching the $50,000 jurisdictional threshold.  *See, e.g.*, *Scarlott v. Nissan North America, Inc.*, 771 F.3d 883, 887-88 (5th Cir. 2014); *Ansari v. Bella Auto. Group, Inc.*, 145 F.3d 1270, 1272 (11th Cir. 1998).

For example, *Scarlott* asserts that the state law claims may not be aggregated without any analysis at all, and cites to a previous Fifth Circuit Case, where the sole support of the contention is a two-line footnote, again without any analysis.  *Ansari*, similarly, provides no analysis, and cites to the same two-line Fifth Circuit footnote.

It appears that the Second Circuit has not addressed this issue to date, and therefore there is no controlling authority to follow.  Plaintiff respectfully submits that the statutory text is unambiguous and the Court should follow the plain reading of the statute.

### 2.  *Plaintiff's Complaint Alleges More Than $50,000 In Damages*

As set forth above, Plaintiff's complaint, on its face seeks approximately $36,330 in diminished value (calculated at the time of suit) (*FAC* at ¶¶ 94-95), plus additional out of pocket damages for repairs of "approximately $3,000".  (*Id*. at 96);

plus $8,240.00 at the time of filing in payments made since the vehicle was garaged (calculated at the time of filing); plus "significant and compensable pain and suffering over an extended period of time in the form of:  stress; anxiety; aggravation, fear for her safety; fear for the safety of family members and others riding in the vehicle, sleeplessness, and loss of peace of mind." (*Id.* at ¶ 97), as well as $1,000 treble damages under GBL § 349; $10,000 treble damages under GBL § 350, and punitive damages under GBL § 349,  GBL § 350 and for fraud, the latter having been pled as "not less than three times her actual damages".[3]

Thus, when all claims this law suit (including available punitive damages) are aggregated, they far exceed the jurisdictional requirement of $50,000, especially considering the nature of the wrong—selling a rebuilt wreck under the guise of a certified pre-owned car. See, Benedetto v. GMAC, 2001 U.S. Dist. LEXIS 25286, 11-13 (W.D. Mo. Apr. 5, 2001)(holding that "the $50,000 requirement is computed on the basis of all claims to be decided in the suit"; stating that "the allegations in this lawsuit [regarding concealment of a vehicle's accident history] describe the kind of outrageous conduct, that if proven, may allow recovery of punitive damages against one or more of the defendants" and denying a motion to dismiss for lack of federal question jurisdiction over MMWA claims because "the Court cannot say that it appears to a legal certainty that Benedetto's MMWA claims are for less than the $ 50,000 jurisdictional amount.")

---

[3] In opposing counsel's affidavit, he claims without citation that punitive damages are not available under NYGBL § 349 or § 350.  LaRose Aff. at pp. 4-5.  The law is contrary to WWC's position.  See, e.g. *Wilner v Allstate Ins. Co.*, 71 A.D.3d 155, 167 (2d Dep't 2010) (holding that "plaintiffs may seek both treble damages and punitive damages" under GBL 349, and collecting cases);

### C. Revocation Is Available To Plaintiff

WWC argues that Plaintiff "is not entitled to a refund" under the MMWA "given the fact that the only warranties issued here are limited ones, which are not subject to section 2304 of the Act and thus not subject to the Act's extensive remedies including a refund of the purchase price.". *WWC Memorandum at 3*.

WWC's argument misconstrues the MMWA, confusing the availability of additional remedies, with the availability of remedies provided for under state law -- such as revocation -- and thereby incorporated into the MMWA.  As one district court has explained:

> Plaintiff contends that the MMWA makes Silverton liable for consequential damages and attorneys fees for violating the terms of the limited warranty. Because Silverton provided only a limited warranty, however, the MMWA does not provide any additional remedies not available under state law. See *Kolle v. Mainship Corp.*, No. 04 Civ. 711 (TCP) (MLO), 2006 U.S. Dist. LEXIS 28956, 2006 WL 1085067, at *2 (E.D.N.Y. Apr. 20, 2006) ("When a warrantor, however, as in the case at bar, issues a limited written warranty, Magnuson-Moss provides that the Court must look to State law to determine a plaintiff's entitlement to damages or other equitable remedies.").

*Kraft v. Staten Island Boat Sales, Inc.*, 715 F. Supp. 2d 464, 478 (S.D.N.Y. 2010).

Likewise, in *Shuldman v. DaimlerChrysler Corp.*, 1 A.D.3d 343 (N.Y. App. Div. 2d Dep't 2003), the Court stated as follows in finding revocation available under the MMWA:

> [T]he MMWA is silent as to the remedies for breach of a limited written warranty (cf. 15 USC § 2304 [a] [4] [a full warranty must include a choice of a refund or replacement without charge for a defective product]). Accordingly, the court must look to state law to determine the plaintiffs' entitlement to damages or other legal or equitable relief (see 15 USC § 2310 [d])

*Id*. at ¶ 344-345 (case citations omitted).

Here it is undisputed that revocation is available under state law.  *Shuldman*, 1 A.D. 3d at 344-345 (collecting cases).  As such, the same relief is available to Plaintiff under the MMWA.  *Id*.; *Murphy v Mallard Coach Co.*, 179 A.D.2d 187, 193 582 N.Y.S.2d 528 (N.Y.A.D. 1992) (reviewing availability of revocation under NYUCC); *Kolle v. Mainship*

14

*Corp.*, 2006 U.S. Dist. LEXIS 28956 (E.D.N.Y. Apr. 20, 2006) (noting availability of revocation as remedy under MMWA).

Nothing in the cases cited by WWC is to the contrary. *MacKenzie v. Chrysler Corp.*, 607 F.2d 1162, 1166, 1979 U.S. App. LEXIS 9872, *11 (5th Cir. 1979) (cited by WWC at page 3 of its memorandum) (holding with regard to express limited warranties that "resort to state law is proper in determining the applicable measure of damages under the Act".); *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004) (also cited by WWC at page 3 of its memorandum) (citing *MacKenzie*, and holding that although Section 2304 did not apply to provide additional remedies in case involving limited warranties, the MMWA imported all remedies available under state law for breach of warranty).

**D.  The Rescission Amount Is Greater Than $50,000**

With regard to rescission/revocation, WWC argues, again without citation, that the amount in controversy ought to exclude various dealer charges directly related to purchase of the vehicle, including "registration, title, add-ons, etc." *LaRose Aff.* at p. 9.

Thus, WWC reasons that the amount in controversy for rescission purposes should not be the "total cash price" of the vehicle, listed on the Retail Instalment Contract as $51,698.65 (*Exhibit C* to Schlanger Decl.) or the "total cash price" of $52,050.65 listed on the purchase order attached to WWC's motion papers, but rather $48,500, which represents the price of the vehicle before all such charges.

Other than getting WWC out of federal court, Defendant offers no rationale for removing the related charges.  Indeed, it makes no sense that revocation – the point of which is to unwind the transaction and Plaintiff in the same position as prior to the sale– would not include out-of-pocket charges so directly incurred as part of the purchase.

15

### E. Plaintiff's Federal Claim, Standing Alone, Exceeds $50,000

In addition to the value of monetary relief sought and the value of rescission both exceeding $50,000,  Plaintiff can plausibly allege that she is entitled to relief under the Magnuson Moss Warranty Act alone that exceeds $50,000 because punitives are available to her under New York warranty law and thus under the MMWA.

Specifically, under New York law (to which the MMWA looks, *supra*), punitive damages are available in contract actions, including claims for breach of warranty, if tort claims arise from the contractual relationship.  *Carvel Crop. v. Noonan*, 350 F.3d 6, 24 (2d Cir. 2003); *Rosen v. Gupta*, 213 F.3d 626 (2d Cir. 2000) (Summary Order) (stating the punitives were not available under Magnuson Moss where the alleged breach of warranty was "unaccompanied by an independent tort").

For example, in *Hudson Motor Partnership v. Crest Leasing Enterprises, Ltd.*, 845 F.Supp. 969 (E.D.N.Y. 1994), the court cited to the following factual examples as warranting award of punitive damages in contract actions:  (1) obligation to obtain an extension of certificate of occupancy, failure to do so, and thwarting plaintiff's attempt to obtain said certificate; (2) conduct that involves a "high degree of bad faith".  *Id.* at 974.  Then the court continued to analyze the case at hand under these principles.  The case involved a car dealer that delivered cars to a leasing company.  The leasing company took possession of the cars and refused to pay for them.  Then it sold them, without valid titles.  Then it gave the dealer three bad checks.  *Id*.

The Court held that because the leasing company went "beyond a mere breach" and "embarked on a course to thwart at every turn plaintiff's contractual rights," in bad faith, punitive damages were available.  *Id.*at 975.

The bad acts of the leasing company in *Hudson* pale in comparison to selling Plaintiff herein a "severely worn rebuilt wrecked vehicle" FAC at 92; *Expert' Report* at page 6. Accordingly, punitive damages are available in this case under the Magnuson-Moss Warranty Act. See FAC at Wherefore Clause (h), seeking "together with such other relief as law and equity may provide, punitive damages. . .".[4]

In sum, it cannot remotely be asserted that this case involves "the legal impossibility of recovery . . . so certain as virtually to negative the plaintiff's good faith in asserting the claim. *Tongkook Am.*, 14 F.3d at 784.   To the contrary, Plaintiff has alleged sufficient facts to plausibly suggest the existence of claims aggregating $50,000.  Conversely, Defendant has failed to show to a legal certainty that Plaintiff's allegations of the amount in controversy does not meet the jurisdictional minimum.

**F.  There Are Multiple Written Warranties Applicable To This Transaction And, As A Result, Any Attempt To Disclaim Implied Warranties is Prohibited**

1.  *Warranties Attached To WWC's Own Papers*

Plaintiff must confess at being a bit perplexed by Defendant's argument that it gave Plaintiff no warranty.  *LaRose Aff.* at p. 10 ("It is respectfully submitted that as a used car, this car did not come with any express or implied written warranties.")

In fact, Defendant's own documents attached to the Affirmation of its counsel, conclusively refute this claim.

- Page three of Defendant's Exhibit G is a "warranty," with "Wide World of Cars" as a warrantor ("THIS IS THE ONLY WARRANTY DEALER PROVIDES ***.").

---

[4] Admittedly, punitive damges are not referenced specifically in connection with the warranty claims in the FAC, only in the wherefore clause.  For this reason, to the extent the Court finds warranty-related punitive damages not adequately pled, and in light of the early stage at which this issue arises in the litigation, Plaintiff requests leave to amend to more explicitly reference punitive damages with regard to her claims under the UCC and MMWA for punitive damages.

- Page one of Defendant's Exhibit G is a federally-mandated Buyers Guide.  It has the word WARRANTY with a big check mark and again refers to the dealer.

These two documents prove several things:  (1) there was a written express warranty in the transaction, (2) as discussed below, by giving a written warranty, the dealer could not, as a matter of law, disclaim any implied warranties (15 U.S.C. §2308(a)[5]); and (3) by not checking the "AS IS" language the dealer in fact did not disclaim any implied warranties. UCC 2-316(3)).

2.  *The CPO Warranty*

Moreover, the Defendants arguments with regard to the CPO warranty must also fail. To wit, WWC states in conclusory fashion in its memorandum that it did not "adopt the manufacturer's warranties".  *WWC Memorandum* at 5.  (See also, LaRose Aff. at p. 10, stating that "the only warranties as a certified pre-owned vehicle are warranties that are issues by MBW NA, LLC, not this defendant.").

As an initial matter, whether the dealer is also a warrantor, it is certainly a "supplier" as that term is defined under the MMWA, and is therefore subject to liability:

> Defendants' argument that Burton-Moore is not a warrantor is ultimately irrelevant. The MMWA defines a warrantor as "any supplier or other person who gives or offers to give a written warranty or who is or may be obligated under an implied warranty." 15 U.S.C. § 2301(5). It also provides a definition of a "supplier," which is "any person engaged in the business of making a consumer product directly or indirectly available to consumers." 15 U. S.C. § 2301(4).

*Schultz v. Burton-Moore Ford, Inc.*, 2008 U.S. Dist. LEXIS 107274 (E.D. Mich. Dec. 2, 2008).

---

[5] Specifically, Section 2308 of the Magnuson-Moss Warranty Act, states, in relevant part,
   **(a) Restrictions on disclaimers or modifications**
   No supplier may disclaim or modify (except as provided in subsection (b) of this section) any implied warranty to a consumer with respect to such consumer product if (1) *such supplier makes any written warranty to the consumer with respect to such consumer product* ***.

There can be no dispute that WWC is in the business of making CPO warranted vehicles available to the public.  Admittedly, the MMWA provides protections from liability for a "supplier who does no more than distribute or sell a consumer product covered by a written warranty offered by another person or business [.]" 16 CFR 700.4.[6]

Here, however, the dealership's role went far beyond that and would easily meet the bar for creation and/or adoption of the CPO warranty.  Specifically, Plaintiff has alleged that WWC inspected the vehicle, confirmed its conformity with the CPO standards, and offered it for sale to Plaintiff, despite the fact that they knew the vehicle was defective and did not meet the CPO standards set forth on the Vehicle Inspection Checklist which it provided to Ms. Pyskaty.  See *FAC* at ¶¶ 68-72.  Plaintiff further alleged that:

> 120.  The Defendants created a written warranty under their advertised CPO program that provides a written affirmation of fact related to the condition of the vehicle and the nature and quality of the workmanship of its technicians and participating dealerships and as such created a written warranty under 15 U.S.C. § 2301(6).
>
> 121.  As the Vehicle sold to Ms. Pyskaty suffers from significant defects in its condition and as the Vehicle was not properly serviced and/or repaired in compliance with the BMW CPO requirements prior to sale, as described above, Defendants have breached the written warranty.

---

15 U.S.C. §2308(a) (emphasis added).

[6] 16 CFR 700.4 states as follows:

> . . . 15 U.S.C. 2310(f), provides that only the supplier "actually making" a written warranty is liable for purposes of FTC and private enforcement of the Act. A supplier who does no more than distribute or sell a consumer product covered by a written warranty offered by another person or business and which identifies that person or business as the warrantor is not liable for failure of the written warranty to comply with the Act or rules thereunder. However, other actions and written and oral representations of such a supplier in connection with the offer or sale of a warranted product may obligate that supplier under the Act. If under State law the supplier is deemed to have "adopted" the written affirmation of fact, promise, or undertaking, the supplier is also obligated under the Act. Suppliers are advised to consult State law to determine those actions and representations which may make them co-warrantors, and therefore obligated under the warranty of the other person or business.

*Id*. at ¶¶ 120-121.  See *Exhibit B* to Schlanger Decl.  (Vehicle Inspection Checklist filled out by Defendant, including Defendant's signed certification on last page that "the vehicle has been carefully inspected and that apparent deficiencies have been corrected").

Checklists like this are considered warranties under the MMWA and New York warranty law.  See e.g., *Marine Midland Bank v Carroll*, 98 A.D.2d 516, 519 (N.Y.A.D. 1984) (pre-delivery inspection form is a "warranty" under the Act); *Murphy v Mallard Coach Co.*, 179 A.D.2d 187, 193 582 N.Y.S.2d 528 (N.Y.A.D. 1992) (same). Compare,  *Laznovsky v. Hyundai Motor Am., Inc*., 190 Misc. 2d 537 (N.Y. Dist. Ct. 2002) (holding that where a dealership did nothing more than note on the sales documents that the balance of the original manufacturer's warranty still applied to the vehicle, and the consumer declined an additional warranty, the dealership could not be held liable, citing 16 C.F.R. § 700.4),  with *Beyer v. DaimlerChrysler Corp.*, 287 A.D.2d 427, 428 (2d Dep't 2001) (the plaintiff's complaint and submissions in opposition to the appellant's motion allege conduct on the part of the appellant which could fall within the definition of a party 'actually making' a written warranty. If the plaintiff can establish that the appellant made a written warranty, the appellant's disclaimer of implied warranties would be ineffective.") (*vacated on other grounds on court's own motion*, at 745 N.Y.S.2d 29).

In sum, whether one refers to the warranties referenced in the Defendant's own exhibits or the warranty it adopted by inspecting and certifying and then advertising and selling the Vehicle as meeting CPO standards, Defendant provided a written warranty in the transaction. Therefore, to the extent it attempted to disclaim any implied warranties, such attempts were legally prohibited and therefore invalid.

With regard to the CPO issue in particular, at a minimum, as in *Beyer*, plaintiff's allegations render the issue of the dealership's making or adoption of the CPO warranty which it provided after its own inspection and certification of the vehicle, a question of fact not amenable to resolution at this stage of the litigation.

### G. Defendant's Other Arguments

The rest of Defendant's arguments is a hodge-podge of denials of elements of Plaintiff's causes of action, not susceptible to resolution on a motion to dismiss.  However, so that not to not waive any arguments, Plaintiff addresses them here.

1.   *Reasonable Opportunity to "Repair"*

Defendant claims Plaintiff did not provide it with "a reasonable opportunity to repair the defects"  *WWC Memorandum* at 5.

As an initial matter, Defendant confuses the opportunity to "cure" with the opportunity to "repair".  As the leading treatise on the MMWA has pointed out:

> Significantly, the statute requires an opportunity to cure, not an opportunity to repair. If the defect cannot be repaired in a way that will give the buyer what she bargained for, the seller is only entitled to an opportunity to cure by replacing the defective product. For example, in the case of a ring that is made out of brass rather than gold as warranted, the seller need only be given an opportunity to replace the product. . . .  Other defects—such as delivery of a tainted product in breach of a warranty of purity—may be incurable other than by replacement, so allowing numerous repair attempts would be futile.

National Consumer Law Center, Consumer Warranties, Section 2.7.3 (citations omitted).

Plaintiff notes in this regard that, notwithstanding Defendant's repeated references to New York's Lemon Law (GBL § 198-a), Plaintiff does not sue under the Lemon Law for failure to repair.  Rather, her claims are grounded in Defendants' deceptive conduct.  For example, with regard Plaintiff's MMWA claim for breach of express written warranties, Plaintiff alleges that the vehicle was falsely certified as meeting CPO requirements when it did

21

not.  *FAC* at ¶¶ 120-121.  Likewise, with regard to Plaintiff's UCC claim for express warranty, Plaintiff alleges in addition to the facts underlying her MMWA express warranty claim as follows:

129.   Specifically, and without limitation, Ms. Pyskaty explicitly stated prior to her purchase of the Vehicle that she required a vehicle with no accidents.

130.   Defendants explicitly represented that the vehicle had suffered no accidents, and as such created an Express Warranty under NY UCC § 2-313.

131.   The vehicle contained a gross defect in that its actual condition and its accident and service history were inconsistent with the oral representations made by the Dealership.

Indeed, Plaintiff explicitly alleged that "[a]s such, and because no repair could rectify the inconsistency, Ms. Pyskaty was entitled to return or replace the vehicle at no additional cost to her but was not permitted to do so.  *Id*. at 132.

Moreover, Defendants' assertion that it had no opportunity to address Plaintiff's issues is directly contradicted by the allegations in the complaint.  *FAC* at ¶¶ 30, 66-76.

2.   *"Disclaimer of Warranties" That Does Not Disclaim Warranties*

Opposing counsel's affidavit references a "Disclaimer of Warranties" in support of its argument that "the only warranties issued in connection with this transaction are ones issued by the manufacturer and not by this dealer."  *LaRose Aff*. at pp. 10-11.  Therefore, Defendant argues, Plaintiff's warranty claims fail to state a claim, and therefore should not be considered in determining this Court's jurisdiction.

As an initial matter, under New York law, whatever disclaimers are applicable in the transaction are not effective if "the allegedly misrepresented facts are peculiarly within the misrepresenting party's knowledge."  *Warner Theatre Assocs. Ltd. P'ship v. Metro. Life Ins. Co.,* 149 F.3d 134, 136 (2d Cir. 1998).  New York courts have held that whether a defendant has peculiar knowledge that defeats a specific disclaimer, thus establishing justifiable reliance,

22

is a matter of fact for the jury.  *See, e.g.*, *Country World v. Imperial Frozen Foods Co.*, 186 A.D.2d 781, 782 (App.Div. 1992) (holding with respect to peculiar knowledge that "[t]here are triable issues of fact as to whether the defendants knew that the apple juice concentrate was adulterated").

Moreover, the actual Disclaimer language, referenced by Defendant, does not disclaim anything of importance.  Specifically, in subsections (2) and (3), it states, "THIS PROVISION *** (2) DOES NOT LIMIT ANY IMPLIED OR OTHER WARRANTIES IMPOSED AS A MATTER OF LAW *** AND (3) DOES NOT LIMIT ANY WARRANTY DESCRIBED IN THIS AGREEMENT OR IN A SEPARATE WRITING GIVEN IN CONNECTION WITH THIS TRANSACTION."

As discussed above, Defendant provided plaintiff with multiple written warranties, including its certified Vehicle Inspection Checklist, warranting that the vehicle met CPO standards.  Moreover, and again as discussed *supra*, Defendant could not legally disclaim implied warranties in this transaction, for two reasons:  (1) by virtue of giving an express warranty, Defendant was precluded from disclaiming implied warranties under Section 2308(a) of the Magnuson-Moss Warranty Act, and, (2) by not checking the AS IS box in the Buyers Guide Defendant failed to properly disclaim implied warranties on its Buyers Guide.  (Page one of Defendant's *Exhibit G*.)

Accordingly, both express and implied warranties, given by the dealer, attached to the transaction, Defendant's denial notwithstanding.  It follows, then, that both of Plaintiff's warranty claims are permitted to be considered in determining this Court's jurisdiction.

23

3.   *"Vehicle History Disclaimer and Release"*

Defendant also argues that a "Vehicle History Disclaimer and Release" absolves

Defendant from any liability for inaccuracies in the Carfax report it provided in the transaction.

*LaRose Aff.* at pp. 11-12.

However, WWC misapprehends Plaintiff's allegations.  Plaintiff does not complain that

Carfax was wrong; Plaintiff complains that Defendant knew Carfax was wrong and used the

supposedly "clean" Carfax as a deceptive sales tactic to conceal prior accident damage in the

car and to create the proverbial "fig leaf" to cover up its fraud.  See FAC at ¶¶ 89-91 alleging,

*inter alia*, that "given the numerous indicators apparent to a BMW dealer but not a lay person

of the vehicle's past, it is clear that [WWC] knew that the service history and Carfax provided

to Ms. Pyskaty were materially inaccurate, incomplete and false at the time provided.") (*id.* at

90).  See Plaintiff's Expert Report (*Exhibit A*) at p. 4. ("It is my opinion that with even the most

cursory visual inspection previous collision damage and subsequent repair of this quality,

would be seen by anyone with at least 6 months of experience in the industry.").

Under New York law there is a duty to disclose material information if one party has

superior knowledge of certain information, that information is not readily available to the other

party, and the first party knows that the second party is acting on the basis of mistaken

knowledge.  *Banque Arabe v. Maryland Nat'l Bank*, 57 F.3d 146, 155 (2d Cir. 1995).  Since

Defendant knew of the accident t damage, or, at a minimum, should have known about it, it

had to disclose it.

Instead, Defendant did something much worse than a mere non-disclosure:  it used a

supposedly "clean" Carfax to facilitate its fraud.  Indeed, one could surmise that the Disclaimer

itself was part of fraudulent scheme.

24

Moreover, disclaimers are not be given effect "where the facts are peculiarly within the knowledge of the party invoking it". *Id.*

Recently, in a fraud context, the Georgia Supreme Court had to address similar misconduct involving a supposedly "clean" Carfax.  In *Raysoni v. Payless Auto Deals, LLC*, 296 Ga. 156, 766 S.E.2d 24 (Ga. S.Ct. 2014) the courts below held that oral misrepresentations, coupled with a supposedly "clean" Carfax, could not prevail over multiple contractual disclaimers, which included:  (1) "NO SALESMAN VERBAL REPRESENTATION IS BINDING ON THE COMPANY", (2) "AS IS NO WARRANTY", (3) "CUSTOMER SHOULD NOTE THAT THIS VEHICLE WAS ANNOUNCED HAVING UNIBODY DAMAGE AT THE AUCTION", and (4) "WE STRONGLY RECOMMEND CUSTOMERS SHOULD GET VEHICLE INSPECTED BY A MECHANIC OF THEIR CHOICE BEFORE MAKING THE PURCHASE."  On this record, the court held that a question of fact still existed regarding the reasonableness of plaintiff's reliance:  "we cannot say as a matter of law that Raysoni will be unable to show that his reliance on representations that the minivan was undamaged and never had been in a wreck—particularly the written Carfax report—was reasonable."  *Id.*, at 28. See also, *Bishop v. E.A. Strout Realty Agency*, 182 F.2d 503, 505 (4th Cir. 1950) ("There is nothing in law or in reason which requires one to deal as though dealing with a liar or a scoundrel. . . was never any credit to the law to allow one who had defrauded another to defend on the ground that his own word should not have been believed.")

Finally, Defendants' reliance on the CARFAX disclaimer is particularly inappropriate where, as here, Defendant simultaneously certified the Vehicle as a CPO that did not have a "[d]isqualifying CARFAX or AutoCheck report", nor an "[i]nconsistent  or incomplete

25

maintenance history".  *FAC* at ¶¶ 68; Vehicle Inspection Checklist (*Exhibit B to* Schlanger

Decl.) at p. 1.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that Defendant's motion

be denied in its entirety.

Date: October 1, 2015

Respectfully Submitted,

*s/Daniel A. Schlanger*
Daniel A. Schlanger, Esq.
Schlanger & Schlanger, LLP
32 Broadway, Suite 601
New York, New York 10004
T: 914-946-1981, ext. 101
F: 914-946-2930
daniel.schlanger@schlangerlegal.com
