## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MAYA PYSKATY,

*Plaintiff,*

v.

WIDE WORLD OF CARS, LLC, d/b/a
WIDE WORLD BMW;
BMW BANK of NORTH AMERICA,

*Defendants.*

Case No. 17-cv-1600(JCM)

## PLAINTIFF'S LOCAL CIVIL RULE 56.1 STATEMENT
## OF UNCONTROVERTED MATERIAL FACTS

Plaintiff Maya Pyskaty, a consumer, brings this action under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, *et seq*., the New York Uniform Commercial Code ("UCC"), common law fraud, New York's General Business Law § 349 (deceptive acts and practices), and New York's General Business Law § 350 (false advertising).  Ms. Pyskaty seeks redress for the illegal, unfair, abusive, and deceptive practices used by Defendant Wide World of Cars, LLC d/b/a Wide World BMW when Ms. Pyskaty purchased a purportedly Certified Pre-Owned BMW automobile from WWC on October 31, 2013.  Co-defendant BMW Bank of North America ("BMW Bank") is the assignee of the retail installment contract between Ms. Pyskaty and WWC.

Plaintiff moves for partial summary judgment on certain claims for violation of the MMWA, the UCC, New York General Business Law § 349 for deceptive acts and practices, and New York General Business Law § 350 for false advertising.

1

With respect to certain other claims under the MMWA and the UCC, and her claims for common law fraud, the pleadings and discovery show that there are multiple issues of fact which can be resolved only at trial, reflecting that summary judgment is not ripe.

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern and Eastern Districts of New York, Ms. Pyskaty, by her attorneys Schlanger Law Group LLP, respectfully submits the following statement of material facts which cannot be genuinely disputed with regard to Ms. Pyskaty's claims.[1]

## FACTS AS TO WHICH THERE CAN BE NO GENUINE DISPUTE

### *Parties*

1.      Plaintiff Maya Pyskaty is a natural person residing in Sussex County, New Jersey. Declaration of Maya Pyskaty in Support of Motion for Summary Judgment dated August 3, 2018 ("Pyskaty Decl."), ¶1.

2.      Ms. Pyskaty is formerly known as Maya Sieber.  Pyskaty Decl., ¶2.

3.      Defendant Wide World of Cars, LLC d/b/a Wide World BMW ("WWC") is a domestic limited liability company formed under the laws of New York located in Rockland County, New York.  Trontz: 114:12-15.  Declaration of Evan S. Rothfarb in Support of Motion for Summary Judgment dated August 3, 2018 ("Rothfarb Decl."), ¶4 and Exhibit A.

4.      Defendant BMW Bank of North America ("BMW Bank") is a domestic limited liability company formed under the laws of Utah.  Rothfarb Decl., 5 and Exhibit B.

---

[1] All Exhibits referenced here and in the Memorandum of Law are attached to the adjoining Declaration of Evan S. Rothfarb or the Declaration of Maya Pyskaty.

*Background*

5.      WWC is a BMW automobile dealership located in Spring Valley, New York. Rothfarb Decl., Exhibit F (Deposition of Michael Trontz) ("Trontz"): 114:12-15; Rothfarb Decl., Exhibit G (Deposition of Michael Jackson) ("Jackson"): Jackson: 153:5-7.

6.      WWC is the only BMW dealership located in Spring Valley, New York.  Trontz: 114:12-15; Jackson: 153:5-7.

7.      In 2013, WWC sold approximately 2,700 vehicles per year.  Trontz: 128:9-11.

8.      Of the 2,700 vehicles WWC sold in 2013, approximately 75% of the vehicles were sold directly to consumer purchasers.  Trontz: 127:19-128:5.

9.      In 2013, WWC sold approximately 700 vehicles that were pre-owned.  Trontz: 128:6-11.

10.     Of the 700 pre-owned vehicles sold by WWC in 2013, WWC sold approximately 98% of the vehicles to consumers.  Trontz: 129:3-6.

11.     In 2013, WWC sold approximately 200 vehicles that were Certified Pre-Owned ("CPO").  Trontz: 51:19-25.

*BMW CPO Program*

12.     WWC has participated in the BMW Certified Pre-Owned BMW Vehicle Program ("CPO Program") since at least the year 2010.  Trontz: 16:10-11; 42:17-43:10.

13.     WWC was a participant in the CPO Program in October 2013.  Trontz: 16:10-11; 42:13-43:6; 45:3-15.

14.     The Certified Pre-Owned by BMW Center Operations Manual dated March 2013 ("CPO Manual") sets forth the operating guidelines and requirements for the CPO Program. Plaintiff's Exhibit 11, at 2 (For ease of review, the exhibits used at the depositions of defense

witnesses are attached to the Rothfarb Decl. as sub-exhibits of "Exhibit I." The sub-exhibits use the same numbering as was utilized at the depositions and appear in the format "Plaintiff's Exhibit ____" for convenience of review.); Trontz: 45:15-25.

15.     The CPO Manual dated March 2013 was the version in effect at WWC in October 2013.  Trontz: 45:3-15.

16.     Dealerships participating in the CPO Program, including WWC, are required to implement and follow the operating guidelines and procedures set forth in the CPO Manual. Plaintiff's Exhibit 11, at 3 (Section 2.1).

17.     The CPO Manual sets forth the Vehicle Qualification Criteria in Section 4. Plaintiff's Exhibit 11, at 5.

18.     Section 4.1.4 of the CPO Manual requires all CPO vehicles to have "an accompanying CARFAX or Experian AutoCheck Vehicle History Report which reflects compliance with CPO enrollment standards."  Plaintiff's Exhibit 11, at 5.

19.     Section 4.1.6 of the CPO Manual requires all vehicles to "meet all Certification requirements as defined by the Vehicle Inspection Guidelines and Standards and the Certification Inspection Checklist."  Plaintiff's Exhibit 11, at 5.

20.     Subsection 4.2 of the CPO Manual sets forth vehicle criteria for disqualification from the CPO Program.  Plaintiff's Exhibit 11, at 5.

21.     Section 4.2.3 of the CPO Manual states that "Vehicles used for rental, commercial, racing, police or emergency purposes" are disqualified from participation in the CPO Program.  Plaintiff's Exhibit 11, at 5.

22.     A vehicle with a CARFAX Vehicle History Report indicating prior commercial use is not eligible for CPO certification under the CPO Manual.  Jackson: 63:15-22.

4

23.    Section 4.2.6 of the CPO Manual disqualifies vehicles from the CPO Program "that have (or have been) . . . f) Inconsistent or incomplete maintenance history (Refer to Vehicle Inspection Guideline and Standard-Maintenance) . . . [and] g) Abused or neglected (Refer to Vehicle Inspection Guideline and Standard-Vehicle Inspection Checklist Section 1:   Vehicle Background Review) . . . ."  Plaintiff's Exhibit 11, at 6.

24.    The CPO Manual does not define what constitutes an "abused or neglected" vehicle.  *See* Plaintiff's Exhibit 11, at 6, 31-32, and 69.

25.    The CPO Manual sets forth the Eight Steps to Certified Pre-Owned BMW Vehicle Program Compliance ("8 Steps").  Plaintiff's Exhibit 11, at 6.

26.    Under Action 1 of the 8 Steps, CPO Program participants are required to "Run a CARFAX or Experian AutoCheck History Report to ensure the vehicle meets CPO enrollment standards."  Plaintiff's Exhibit 11, at 7.

27.    Under Action 4 of the 8 Steps, CPO Program participants are required to "Fill out, stamp, sign, and give The Statement of Certification to the Sales Department for presentation to the final retail customer."  Plaintiff's Exhibit 11, at 7.

28.    Under Action 7 of the 8 Steps, CPO Program participants are required to "Prepare and present the following items to the customer at delivery:  . . . Statements of Certification . . . All applicable Disclosures (Forms pgs 74-74) . . . Copy of CPO Inspection Checklist [Calif. Customers Mandatory]. . . ."   Plaintiff's Exhibit 11, at 7.

29.    The CPO Manual contains a blank template containing the 8 Steps.  Plaintiff's Exhibit 11, at 77.

30.    The CPO Manual contains a blank template entitled Statement of Certification for CPO vehicles.  Plaintiff's Exhibit 11, at 80.

31.     The CPO Manual sates that "[u]nder no circumstances should a vehicle be: 1) processed by the center as Certified, 2) represented to a customer for sale as Certified, or 3) sold as Certified until the center has confirmed enrollment in the Program . . . . A center that offers a non-Certified vehicle for sale as a Certified vehicle is guilty of mis-representation . . . ." Plaintiff's Exhibit 11, at 14.

32.     The CPO Manual requires "the selling center to provide the purchaser full disclosure (see Section 9 Pre-Owned Vehicle Disclosure Notice)."  Plaintiff's Exhibit 11, at 17.

33.     Section 9 of the CPO Manual sets forth the policy with respect to the required Pre-Owned Vehicle Disclosure Notice.  Plaintiff's Exhibit 11, at 19.

34.     The Pre-Owned Vehicle Disclosure Notice in the CPO Manual requires as follows:

> "It is BMW NA policy that the selling center must provide the purchaser of any BMW, whether New, CPO or pre-owned — with full disclosure (see Forms page 76) of any known information about the vehicle. Strict adherence to this full disclosure policy is a sound business practice that will contribute to customer satisfaction. More importantly, full disclosure is a legal requirement in most states in the United States, as well as a BMW Group policy requirement.
>
> This disclosure must include (but not be limited to) previous paint and body damage repairs, prior repurchase/trade assistance, or any other such relevant information available to the selling center. It should be made clear to the customer that this is a pre-owned vehicle and that no claim is made, implied or otherwise, that this vehicle is in "new condition."

Plaintiff's Exhibit 11, at 19.

35.     The CPO Manual contains a Sample Damage Disclosure Notice template ("Damage Disclosure Notice").  Plaintiff's Exhibit 11, at 74-75.

36.     The Damage Disclosure Notice includes fields to describe "important background information" concerning CPO vehicles, disclose "Other" vehicle history or background information, and "reported damage, concerns, or condition[s]."  Plaintiff's Exhibit 11, at 74-75.

37.     The Damage Disclosure Notice also includes an area to "list specific repairs" that have been made on a vehicle.  Plaintiff's Exhibit 11, at 75.

38.     Section 13 of the CPO Manual sets forth "Non-Compliance with CPO Program Operating Guidelines, Criteria, and Processes."  Plaintiff's Exhibit 11, at 22.

39.     Included in the definition of "Improper Reconditioning" in the CPO Manual is "[r]epresenting a vehicle which does not meet Program Standards and Guidelines as CPO, including but not limited to:  . . . Any criteria for Program disqualification as outlined in CPO Operations Manual . . . [and] Failure to follow and fulfill BMW Group Disclosure Policy."  Plaintiff's Exhibit 11, at 22.

40.     Section 13.1 of the CPO Manual governs specifically prohibited operating practices.  Plaintiff's Exhibit 11, at 22.

41.     CPO Program participants are specifically barred from enrolling ineligible vehicles in the CPO Program.  Plaintiff's Exhibit 11, at 23. (Sections 13.1.1).

42.     If an ineligible vehicle is enrolled in the CPO Program, the "Center must advise the customer(s) in writing that the sale as a Certified Program vehicle was incorrect and take whatever steps necessary to satisfy the customer, including repurchase."  Plaintiff's Exhibit 11, at 23.

43.     The CPO Manual contains a Certified Pre-Owned by BMW Vehicle Inspection Checklist ("VIC").  Plaintiff's Exhibit 11, at 69-72; Jackson: 51:4-22.

44.     Completion of the VIC is a required step before a Vehicle may be designated as CPO.  Plaintiff's Exhibit 11, at 7 (Sections 2-3).

45.     Under the CPO Manual, the basic header data in the VIC, which is to be completed by the Pre-Owned Manager, functions as a work order to the Service Department to conduct the BMW CPO Inspection.  Plaintiff's Exhibit 11, at 31.

46.     The basic header data in the VIC includes a line beginning "SOURCE" with individual checkboxes accompanying the following choices:  BMW FS OFF-LEASE, OTHER OFF-LEASE, TRADE-IN, AUCTION, and OTHER.  Plaintiff's Exhibit 11, at 31.

47.     Under the CPO Manual, the Vehicle Background & Maintenance section of the VIC (Section 1) is to be completed by the Service Advisor.  Plaintiff's Exhibit 11, at 31.

48.     Under the CPO Manual, the Service Advisor is responsible for answering the question on the VIC, "Does CARFAX or AutoCheck report disqualify for CPO?"  Plaintiff's Exhibit 11, at 31; *Compare* Plaintiff's Exhibit 23, at 1.

49.     The VIC contains a specific cautionary warning, stating "STOP!  Vehicles **NOT** qualified for enrollment or sale as CPO: . . . Inconsistent or incomplete maintenance history . . . Disqualifying CARFAX or AutoCheck report."  Plaintiff's Exhibit 11, at 69; *Compare* Plaintiff's Exhibit 23, at 1.

50.     The CPO Manual directs the Service Advisor to consider the following in reviewing the vehicle: "Does your repair order history, the DCSnet Warranty Vehicle Inquiry, or the CARFAX or the Experian AutoCheck Vehicle History Report reflect any body repairs or shortcomings?  Please review Section 9: Pre-Owned Disclosure Notice for BMW NA's policy of full disclosure of any known damage and repair information about a vehicle."  Plaintiff Exhibit 11, at 32.

51.     The CPO Manual contains a Center Participation Agreement for Authorized BMW Passenger Car and BMW SAV Centers Only.  Plaintiff's Exhibit 11, at 68.

52.     A dealership must complete the Center Participation Agreement for Authorized BMW Passenger Car and BMW SAV Centers Only in order to participate in the CPO Program. Plaintiff's Exhibit 11, at 68.

53.     Under the terms of the Center Participation Agreement for Authorized BMW Passenger Car and BMW SAV Centers Only, CPO Program participants must ". . . fully disclose to the purchaser or lessee of any Certified Pre-Owned BMW passenger vehicle . . . all damage, repairs and prior repurchase/trade assist information in accordance with applicable law or BMW NA policies."  Plaintiff's Exhibit 11, at 68.

### *WWC CPO Process*

54.     WWC has developed its own internal procedures related to the CPO Program (the "WWC Procedures").  *See* Plaintiff's Exhibit 12.

55.     The WWC Procedures do not reference, incorporate or otherwise address BMW's Pre-Owned Vehicle Disclosure Notice policy or the Damage Disclosure Notice.  *See* Plaintiff's Exhibit 12.

56.     The service operation at WWC does not complete Damage Disclosure Notices as part of its operations, including as part of the CPO certification process.  Jackson: 122:6-17.

57.     WWC does not disclose prior accident damage to its customers unless the repairs are documented in the BMW system, even when WWC itself makes repairs on the vehicle. Trontz:  70:19-71:10.

***WWC Acquisition of the Vehicle***

58.     WWC purchased the vehicle later sold to Maya Pyskaty (the "Vehicle") from Rockland Motors & Sales on October 5, 2013.  Trontz: 39:14-16.

59.     WWC purchased the Vehicle pursuant to a Purchase Agreement for which it agreed to pay the seller, identified as Congers Auto Sales, the sum of $39,500.  Plaintiff's Exhibit 10, at 1.

60.     WWC appraised the value of the Vehicle at $39,500 on October 7, 2013.  Trontz: 36:15-37:8; Plaintiff's Exhibit 10, at 4.

61.     With regard to the acquisition of used vehicles, WWC has a policy that no car is acquired or paid for without examining its CARFAX vehicle history report for abnormalities. Trontz: 32:23-33:3.

***CPO Enrollment and Isabelle Torres***

62.     Following receipt of the Vehicle, as indicted on the VIC, WWC enrolled the Vehicle in the CPO Program on October 10, 2013.  Plaintiff's Exhibit 23, at 1; Plaintiff's Exhibit 21, at 4; Plaintiff's Exhibit 22, at 4.

63.     WWC obtained a CARFAX report dated October 10, 2013 for the Vehicle. Plaintiff's Exhibit 15, at 1; Plaintiff's Exhibit 20; Trontz: 111:5-7.

64.     As part of the CPO certification process in 2013, WWC assigned the responsibility for completion of Section 1 of the VIC for CPO Vehicles to Isabelle Torres. Jackson: 53:3-8; 56:21-25.

65.     Ms. Torres signed the VIC of CPO vehicles as the Service Advisor.  Jackson: 53:3-8; 56:21-25.

66.     In 2013, Isabelle Torres was employed as a receptionist for WWC.   Jackson: 47:3-48:6; Plaintiff's Exhibit 23.

67.     Ms. Torres was not a Service Advisor.   Jackson: 46:18-19.

68.     Nevertheless, it was part of Isabelle Torres' core job duties at WWC to complete the Service Advisor portion of the VIC for CPO vehicles.   Jackson: 53:3-8; 56:21-25.

69.     Ms. Torres was not qualified to determine whether an AutoCheck or CARFAX vehicle history report disqualified a vehicle from CPO certification.   Jackson:  57:2-58:9.

70.     Mr. Torres worked in the Service Department under Michael Jackson, the Service Manager, and was responsible for CPO paperwork.   Jackson: 48:3-8; 53:3-8; 56:21-25.

71.     With regard to review of vehicle history contained in CARFAX vehicle history, Mr. Jackson instructed Ms. Torres that her only function was to obtain a CARFAX, not to review the contents of the vehicle history report.   Jackson: 55:13-23.

72.     Prior to working as a receptionist for WWC, Ms. Torres had not worked at other auto dealerships.   Jackson:  48:16-19.

73.     During her time at WWC as a receptionist in 2013, Ms. Torres signed that she was a Service Advisor and completed Section 1 of the VIC for more than 200 CPO vehicles.   Trontz: 51:3-11; Jackson: 50:15-25.

74.     During her tenure as a receptionist at WWC, Ms. Torres completed Section 1 of the VIC for the Vehicle sold to Ms. Pyskaty and signed her name as the Service Advisor.   Jackson: 56:6-25; Plaintiff's Exhibit 23, at 1.

75.     In the VIC for the Vehicle, Ms. Torres placed a checkmark in the box for "NO" in answer to the question, "Does CARFAX or AutoCheck report disqualify for CPO?"   Plaintiff's Exhibit 23, at 1; Jackson: 56:6-25.

### *CPO Inspection by William Ace*

76.     William Ace was employed by WWC as a Master Technician.  Rothfarb Decl.,
Exhibit H (Deposition of Michael Trontz) ("Act"): 12:17-19.

77.     Acting as a Technician for the VIC of the Vehicle, Mr. Ace inspected the Vehicle
on behalf of WWC for CPO certification.  Plaintiff's Exhibit 23, at 4.

78.     Mr. Ace certified twelve cars or less for CPO purposes during his eleven months
as an employee of WWC.  Ace: 18:11-14.

79.     CPO certification was not a major part of his job responsibilities.  Ace: 18:11-14.

80.     Mr. Ace did not consult the CPO Manual or any other materials other than the
VIC in performing CPO vehicle inspections while employed at WWC.  Ace: 60:19-61:4.

81.     With regard to the CPO process, Mr. Ace's role was limited to the completion of
Sections 2 through 6 of the VIC.  Ace: 53:13-20.

82.     However, Mr. Ace was qualified to determine whether the Vehicle had been
involved in prior accidents.  Jackson: 71:5-8.

83.     Mr. Ace did not review the accident history of the Vehicle contained in any
CARFAX or AutoCheck report to determine whether the report accurately indicated whether the
Vehicle had sustained damage in prior accidents, despite that he had the ability to assess prior
accident damage.  Ace: 31:19-22; Jackson: 71:5-8.

84.     Mr. Ace did not complete a Damage Disclosure Notice set forth in the CPO
Manual.  Ace: 31:19-22.

85.     Mr. Ace did not review the CARFAX report relied upon by WWC to determine
whether the Vehicle was disqualified from the CPO Program.  Ace:  28:24-31:21.

86.     Mr. Ace signed the VIC for the Vehicle.  Plaintiff's Exhibit 23, at 4.

87.     Mr. Jackson also signed the VIC for the Vehicle.  Plaintiff's Exhibit 23, at 4.

### *WWC Representations to Maya Pyskaty*

88.     On October 31, 2013, Ms. Pyskaty and her now husband, Stephen Pyskaty, traveled to WWC in Spring Valley, New York, seeking to purchase a BMW with CPO certification for her personal, non-commercial use.  Pyskaty Decl. ¶3.

89.     Ms. Pyskaty had identified a vehicle she was interested in purchasing that had been advertised on the Internet by WWC.  Pyskaty Decl. ¶4.

90.     In reviewing the vehicle advertisement, Ms. Pyskaty reviewed WWC's website, which indicated that the "Certified-Pre-Owned title is awarded only to those used BMWs that meet our demanding standards and pass a meticulous certification process."  Pyskaty Decl. ¶5.

91.     Upon arrival at WWC, Ms. Pyskaty was told by WWC's representatives that the advertised vehicle was no longer available.  Pyskaty Decl. ¶7.

92.     Ms. Pyskaty considered at a second vehicle at WWC.  Pyskaty Decl. ¶8.

93.     WWC informed Ms. Pyskaty that the second vehicle could be certified for an additional $2,000 - $3,000.  Pyskaty Decl. ¶9.

94.     Because the second vehicle was offered on terms less favorable than those advertised on WWC's website, Ms. Pyskaty declined to purchase it.  Pyskaty Decl. ¶10.

95.     Ms. Pyskaty ultimately became interested in a third vehicle, which is the Vehicle at issue in this litigation.  Pyskaty Decl. ¶11.

96.     WWC offered the Vehicle for sale as CPO.  Pyskaty Decl. ¶12.

97.     The Vehicle had multiple written indicators affixed to it reflecting that it was a CPO automobile, including a Monroney Label indicating CPO and Windshield Clings stating "Certified Pre-Owned by BMW."  Pyskaty Decl. ¶13.

98.     WWC's agents represented to Ms. Pyskaty that the Vehicle was CPO and eligible for favorable financing rates.  Pyskaty Decl., ¶14.

99.     Ms. Pyskaty asked the WWC salesperson, Moon Hasan, about the history of the Vehicle and physical condition, including specifically asking whether the Vehicle had been in an accident.  Pyskaty Decl., ¶15.

100.    Mr. Hasan told Ms. Pyskaty that the Vehicle had no accident history, was "perfect" and had a "clean" CARFAX Vehicle History Report.  Pyskaty Decl., ¶16.

101.    Mr. Hasan further stated to Ms. Pyskaty that both he and a manager named "Joey" had been driving the car and had both determined that it was a good car.  Pyskaty Decl., ¶17.

### Sale of the Vehicle

102.    On October 31, 2013, WWC sold Ms. Pyskaty a BMW 750Li with XDrive bearing Vehicle Identification Number (VIN) WBAKC8C54ACY68053.  Pyskaty Decl., ¶18.; Plaintiff's Exhibit 14.

103.    As part of the purchase transaction, Ms. Pyskaty and WWC entered into the BMW Financial Services Motor Vehicle Retail Installment Contract – New York.  Exhibit 14, at Section 11; Trontz:  81:9-12.

104.    As part of the sale of the Vehicle, WWC provided Ms. Pyskaty with a CARFAX report for the Vehicle dated October 31, 2013.  Pyskaty Decl., ¶19; Plaintiff's Exhibit 21.

105.    At the time of the sale on October 31, 2013, WWC provided Ms. Pyskaty with a Buyers Guide.  Pyskaty Decl., ¶20.; Plaintiff's Exhibit 26, at 1.

106.    The Buyers Guide identified the Vehicle by VIN, model number, model year, and dealership.  Plaintiff's Exhibit 26, at 1.

14

107.   The Buyers Guide stated that a limited warranty applied to the Vehicle. Plaintiff's Exhibit 26 (first "X").

108.   The Buyers Guide stated that a Certified Pre-Owned Limited Warranty applied to the Vehicle.  Plaintiff's Exhibit 26 (second "X").

109.   WWC did not provide Ms. Pyskaty with the Statement of Certification for the Vehicle at the time of sale.  Pyskaty Decl., ¶21.

110.   WWC did not provide Ms. Pyskaty with the VIC for the Vehicle at the time of sale.  Pyskaty Decl., ¶22.

111.   WWC did not provide Ms. Pyskaty with a Damage Disclosure Notice for the Vehicle at the time of sale.  Pyskaty Decl., ¶23.

### *Assignment to BMW Bank*

112.   After the sale of the Vehicle to Ms. Pyskaty, WWC assigned the BMW Financial Services Motor Vehicle Retail Installment Contract – New York to BMW Bank.  Plaintiff's Exhibit 14, at Section 11; Trontz: 85:3-15.

113.   BMW Bank was identified as the lienholder on the Certificate of Title for the Vehicle issued in New Jersey to Ms. Pyskaty.  Pyskaty Decl., ¶24.

114.   BMW Bank has been the recipient of each monthly payment made by Ms. Pyskaty on the Vehicle since purchase.  Pyskaty Decl., ¶25.

### *Persistent Vehicle Problems*

115.   Within the first week of owning the vehicle, Ms. Pyskaty experienced vehicle vibrations and contacted WWC.  Pyskaty Decl., ¶26.

116.   WWC indicated to Ms. Pyskaty, through her husband, that the vibration was normal and would go away.  Pyskaty Decl., ¶27.

117.    When the vibration did not go away over the course of the next few weeks, and noticing the Vehicle consumed excessive amounts of oil, Ms. Pyskaty took the Vehicle to a local BMW dealer (not WWC), and was told that BMW of North America did not authorize any repair, and instead she should monitor the Vehicle's oil consumption, and that the service center's tightening of the suspension should address the vibration issue.  Pyskaty Decl., ¶28.

118.    Over the next several months (into January 2014), and in light of continuation of the existing problems (including vehicle vibration), and emergence of new problems, such as lack of power on acceleration, brought the Vehicle back to a local BMW dealership repeatedly, to no avail.  Pyskaty Decl., ¶29.

119.    During this time period, Ms. Pyskaty noticed that the door locks began to malfunction, periodically making it impossible for the driver to open the driver's side door from the inside of the Vehicle.  Pyskaty Decl., ¶30.

120.    Eventually, Ms. Pyskaty took the Vehicle to another BMW service center, where the excessive oil consumption was addressed. However, despite additional repairs aimed at fixing the problem, the Vehicle vibration issue continued.   Pyskaty Decl., ¶31.

121.    Attempting to fix the problem, Ms. Pyskaty purchased new tires and rims for the Vehicle, but the problem continued unabated.  Pyskaty Decl., ¶32.

122.    After BMW Bank refused to cover having an alignment (with the original stock tires and rims) under the warranty, Ms. Pyskaty then had alignment adjustment on the Vehicle at her expense to attempt to remedy the vibration.  Pyskaty Decl., ¶33.

123.    This work did not resolve the vibration issue, which had become so pronounced that Ms. Pyskaty could not sit comfortably in the driver's seat while operating the car.  Pyskaty Decl., ¶34.

124.    Ms. Pyskaty was instructed by BMW of North America to go back to the dealership where she purchased the Vehicle because BMW of North America could not assist her with the problems she was experiencing.  Pyskaty Decl., ¶35.

125.    After several telephone calls to WWC in early June 2014, WWC provided a copy of the VIC for the Vehicle to Mr. and Ms. Pyskaty.  Pyskaty Decl., ¶36; Plaintiff's Exhibit 23.

126.    After receiving the VIC, Mr. and Ms. Pyskaty returned to WWC and spoke with Manager Michael Trontz about the problems Ms. Pyskaty had been experiencing with the Vehicle.  Pyskaty Decl., ¶37.

127.    Ms. Pyskaty explained to Mr. Trontz the problems she had experienced with the Vehicle as well as the inability of any BMW service centers to correct the vibration.  Pyskaty Decl., ¶38.

128.    Ms. Pyskaty indicated to Mr. Trontz her desire to revoke acceptance of the Vehicle and arrange for return, refund, and rescission.  Pyskaty Decl., ¶39.

129.    WWC did not agree to Ms. Pyskaty's demand for return, refund and rescission. Pyskaty Decl., ¶40.

130.    Mr. Trontz stated at the time that WWC would only be willing to take the vehicle back as a trade-in on another vehicle that Ms. Pyskaty would have to purchase from WWC. Pyskaty Decl., ¶41.

131.    Mr. Trontz further advised Ms. Pyskaty that WWC would now value the Vehicle at only $35,000 and even then, only for purpose of trade-in.  Pyskaty Decl., ¶42.

132.    Ms. Pyskaty declined WWC's offer for $35,000 for the Vehicle.  Pyskaty Decl., ¶43.

*Documented Vehicle Accident and Ownership History*

133.    Following the continued problems with the Vehicle and WWC's refusal to take back the Vehicle, Ms. Pyskaty and Mr. Pyskaty obtained an AutoCheck Vehicle History Report on the Vehicle on June 12, 2014 ("AutoCheck Report").  Pyskaty Decl., ¶44; Plaintiff's Exhibit 22.

134.    The AutoCheck Report revealed that the Vehicle had been in a rear impact collision on August 24, 2012 from which the Vehicle had been towed.  Plaintiff's Exhibit 22, at 3.

135.    The AutoCheck Report also indicated that the Vehicle had been used as a fleet, rental and/or lease and had been noted as Fleet/Lease at auction.  Plaintiff's Exhibit 22, at 3.

136.    Subsequently, it was discovered that the Vehicle was first leased by Multistate Restoration, Inc.  Rothfarb Decl., ¶¶6-8 and Exhibit C.

137.    Multistate Restoration, Inc. is a domestic business corporation located in Providence, Rhode Island, that is duly registered with the Office of the Secretary of State Rhode Island.  Rothfarb Decl., ¶9 and Exhibit D.

138.    In a supplemental document production by WWC dated April 13, 2017, WWC produced DCS Net Warranty Vehicle Inquiry dated October 10, 2013 (an internal BMW background inquiry), but redacted the customer information section (i.e., prior owner information).  Rothfarb Decl., ¶10 and Exhibit E.

139.    Despite WWC's redaction of the prior owner information (showing a commercial prior owner), Plaintiff discovered the identity of the first lessee through third-party records and Vehicle history information contained in the CARFAX report dated October 31, 2013.  Rothfarb Decl., ¶10.

### *Counsel Negotiations with WWC*

140.    Within weeks after WWC refused to honor Ms. Pyskaty's revocation, she sought out and retained counsel to represent her in July 2014.  Rothfarb Decl., ¶6.

141.    Following retention of counsel, Ms. Pyskaty again attempted to revoke her acceptance of the Vehicle through counsel by written letter dated July 23, 2014.  Rothfarb Decl., ¶7; Plaintiff's Exhibit 16.

142.    By written correspondence dated August 7, 2014 from Michael Trontz (the "Trontz Letter"), WWC refused to accept Ms. Pyskaty's revocation of the Vehicle.   Rothfarb Decl., ¶8; Plaintiff's Exhibit 15.

143.    The Trontz Letter contains numerous statements regarding the conditions of sale of the Vehicle.  Plaintiff's Exhibit 15.

144.    The Trontz Letter stated that WWC sold the Vehicle to Ms. Pyskaty that "met all of the conditions, guidelines and standards established by BMW NA, the manufacturer, for their pre-owned vehicle certification program . . . ."  Plaintiff's Exhibit 15, at 3.

145.    The Trontz Letter stated the Vehicle was "'Certified' in accordance with the process and procedure outlined by BMW NA to BMW NA Standards.  This certification was completed on or about October 13, 2013 and included the required BMW NA Carfax report."  Plaintiff's Exhibit 15, at 3.

146.    The Trontz Letter also denied revocation on grounds that Plaintiff's counsel's letter sought re-payment of negative equity from a trade-in vehicle. Plaintiff's Exhibit 15, at 4.

147.    By letter dated August 21, 2014, Plaintiff's counsel clarified that Plaintiff was not seeking return of funds corresponding to negative equity in the trade-in vehicle and again requested revocation.  Rothfarb Decl., ¶8 and Exhibit I.

148.     WWC did not agree to revocation and this lawsuit followed.  *See* Complaint dated March 4, 2015 (Docket Entry No. 1).

### Affirmative Misrepresentations and Non-Compliance with CPO Program

149.     WWC falsely represented to Ms. Pyskaty that the Vehicle had been properly certified as CPO on October 31, 2013.  Plaintiff's Exhibit 11; Plaintiff's Exhibit 21; Pyskaty Decl., ¶¶12-14.

150.     WWC also falsely represented to Ms. Pyskaty that the Vehicle was CPO eligible on October 31, 2013.  Plaintiff's Exhibit 11; Plaintiff's Exhibit 21; Pyskaty Decl., ¶¶12-14.

151.     The Pre-Owned Vehicle Disclosure Notice Section of the CPO Manual in effect in 2013 entitled Ms. Pyskaty to full disclosure of any known information about the Vehicle, including previous paint and body damage repairs, and any other such relevant information available to WWC.  Plaintiff's Exhibit 11, at 19.

152.     By not adhering to Pre-Owned Vehicle Disclosure Notice policy in the CPO Manual with respect to Ms. Pyskaty, WWC improperly reconditioned the Vehicle under the CPO Program.  Plaintiff's Exhibit 11, at 19 and 22.

153.     By representing the Vehicle was CPO and providing a disqualifying CARFAX report dated October 31, 2013, WWC improperly reconditioned the Vehicle under the CPO Program with respect to Ms. Pyskaty.  Plaintiff's Exhibit 11, at 5-7 and 22; Plaintiff's Exhibit 21.

154.     By selling the Vehicle to Ms. Pyskaty as CPO when the Vehicle had not been (and could not be) granted CPO status, WWC committed a misrepresentation under the CPO Program.  Plaintiff's Exhibit 11, at 14.

155.    By not advising Ms. Pyskaty in writing that the sale of the Vehicle as CPO was in error and not offering Ms. Pyskaty a refund or taking whatever were necessary to satisfy her, WWC violated the terms of the CPO Program.  Plaintiff's Exhibit 11, at 23.

156.    WWC provided a VIC for the Vehicle to Ms. Pyskaty that indicated the source of the Vehicle was BMW FS-Off Lease.  Plaintiff's Exhibit 23, at 1.

157.    However, WWC had not obtained the Vehicle through BMW FS-Off Lease and it was a false statement of fact.  Trontz: 119:9-23.

158.    WWC purchased the Vehicle from a dealership, Rockland Motors & Sales, and prior to that the Vehicle had been sold at auction.  Plaintiff's Exhibit 23, at 4.

159.    WWC provided a VIC of the Vehicle to Ms. Pyskaty that indicated that the Vehicle did not have a disqualifying CARFAX or AutoCheck report.   Pyskaty Decl., ¶36; Plaintiff's Exhibit 23, at 1.

160.    WWC provided a CARFAX to Ms. Pyskaty dated October 31, 2013 stating that "Owner 1" of the Vehicle was type "Commercial."  Plaintiff's Exhibit 21, at 1, 2 and 3.

161.    WWC provided a CARFAX to Ms. Pyskaty dated October 31, 2013 indicating that on February 23, 2010, the Vehicle was titled or registered as a commercial vehicle.  Plaintiff's Exhibit 21, at 3.

162.    Commercial use disqualifies a Vehicle from being certified as CPO.  Plaintiff's Exhibit 11, at 5; Jackson: 63:15-22.

163.    WWC provided a VIC for the Vehicle to Ms. Pyskaty that stated Ms. Torres was a Service Advisor, when in fact she was not a Service Advisor, Ms. Torres could not perform the tasks required of a Service Advisor, and Ms. Torres was instructed by Mr. Jackson not to

perform the tasks assigned to the Service Advisor by the CPO Manual.  Plaintiff's Exhibit 23, at 1; Jackson: 46:18-19; 55:13-23; 57:2-58:9.

164.    Ms. Torres completed the Section 1 of the VIC for the Vehicle provided to Ms. Pyskaty, including the checking the box indicating that the Vehicle did not have a disqualifying CARFAX or AutoCheck report for CPO purposes.  Plaintiff's Exhibit 23, at 1; Jackson: 57:2-16.

165.    WWC did not provide Ms. Pyskaty with a Statement of Certification regarding the Vehicle at the time of sale or at any time thereafter.  Pyskaty Decl., ¶21.

166.    The Statement of Certification extant in WWC's files is dated October 16, 2014, nearly a year after Ms. Pyskaty purchased the Vehicle.  Plaintiff's Exhibit 19; Jackson: 115:22-116:16.

167.    The Statement of Certification for the Vehicle was signed by two separate individuals, one of whom was Isabel Torres.  Plaintiff's Exhibit 19; Jackson: 115:22-116:16.

168.    WWC has no basis believe the Statement of Certification for the Vehicle was signed on any other date than October 16, 2014.  Trontz: 109:4-111:2.

### *Subsequent Developments*

169.    In July 2014, Ms. Pyskaty continued to experience continued persistent vibration, and noticed additional problems, including lack of power and acceleration, and uneven tire wear despite obtaining an alignment.  Pyskaty Decl., ¶45.

170.    Later in July 2014, Ms. Pyskaty experienced intermittent loss of power steering despite the power steering fluid level being full.  Pyskaty Decl., ¶46.

171.    Because she felt both unsafe and uncomfortable driving the Vehicle, given its numerous and substantial defects, Ms. Pyskaty took the Vehicle off the road and has kept it "garaged" since that time.  Pyskaty Decl., ¶47.

172.    The Vehicle has been securely stored in a heated garage with limited access. Pyskaty Decl., ¶48.

173.    Since purchasing the Vehicle from WWC, the Vehicle has not been in any frontal or rear collisions, no body panels have been replaced, and no paint has been applied the exterior of the Vehicle.  Pyskaty Decl., ¶49.

### *Noticeable Vehicle Defects*

174.    The Vehicle exhibits a plethora of traits that, although not apparent to the layperson, would unequivocally inform a BMW dealership such as WWC that the vehicle had been in one or more major accidents.  *See* Rothfarb Decl., ¶22, Exhibit M and Exhibit N (collectively, "Grismer Report"); Rothfarb Decl., ¶20 and Exhibit L ("Saliani Report"); Rothfarb Decl., ¶19 and Exhibit K ("Jackson Report")

175.    The Vehicle sold by WWC to Ms. Pyskaty would not pass in the trade without objection based on its readily apparent accident history.  Grismer Report; Saliani Report; Jackson Report; Jackson: 162:23-163:12.

176.    The Vehicle exhibits signs that it had been in one or more major accidents; sustained damage in frontal and rear collisions; body panels had been replaced; and extensive non-factory re-painting of poor quality has been performed.  Jackson: 162:23-163:12; Saliani Report.

177.    In performing his inspection, WWC's own Service Manager indicated that the Vehicle exhibited indicators that it had been in one or more accidents and had very bad body work repairs. Jackson: 162:23-163:12.

178.    Similarly, WWC's paint expert concluded that the Vehicle contains poor paint quality and fit and finish to the left side of the vehicle, a paint blemish on the left side roof rail,

orange peel is present on all left side panels and decklid, and the Vehicle exhibits poor quality repairs.  Saliani Report.

### Advertisement of the Vehicle

179.    On October 10, 2013, WWC put the Vehicle out for sale as CPO.  Plaintiff's Exhibit 21, at 4; Plaintiff's Exhibit 22, at 4; Jackson: 153:5-7; Trontz: 114:12-15.

180.    The history of the Vehicle in the CARFAX report dated October 31, 2013 reflects that WWC offered the Vehicle for sale as CPO on October 10, 2013.  Plaintiff's Exhibit 21, at 4; Jackson: 153:5-7; Trontz: 114:12-15.

181.    The history of the Vehicle in the AutoCheck Report dated June 12, 2014 reflects that WWC offered the Vehicle for sale as CPO beginning on October 10, 2013.  Plaintiff's Exhibit 22, at 4; Jackson: 153:5-7; Trontz: 114:12-15.

182.    On October 31, 2013, the Vehicle was advertised to consumers on WWC's lot through affixed labels indicating the Vehicle was CPO.  Pyskaty Decl., ¶13.

183.    WWC regularly advertises and markets CPO vehicles on the Internet to consumers.  Trontz: 59:13-23 and 129:7-17.

184.    The CPO designation adds value to the resale of Vehicles for WWC.  Trontz: 129:18-20

### Out-of-Pocket Losses

185.    The cost of Ms. Pyskaty's loan on the Vehicle will in total equal $74,187.36 (including all interest) (the "Loan").  Pyskaty Decl., ¶50.

186.    The total cost of the Loan includes $54,229.82 for the Vehicle (including interest) and $19,957.54 (including interest) as the "rolled over" portion loan from a prior BMW vehicle purchase ("Prior BMW").  Pyskaty Decl., ¶51.

187.    The monthly payment amount of the Loan is $1,030.38.  Pyskaty Decl., ¶52.

188.    As of July 27, 2018, Ms. Pyskay has paid BMW Bank for 57 of the 72 months of the Loan equal to $58,731.66.  Pyskaty Decl., ¶53.

189.    As of July 27, 2018, Ms. Pyskaty paid $42,931.94 to BMW Bank with respect to the Vehicle portion of the Loan and $15,799.72 with respect to the Prior BMW.  Pyskaty Decl., ¶54.

190.    In addition, Ms. Pyskaty has incurred incidental damages in attempting to repair the Vehicle in the following amounts:

| | |
|---|---|
| Drive Train Malfunction on 1/23/14 | $53.50 |
| Fixing Rim on 3/28/14 | $160.50 |
| Leaking Valve on 4/29/14 | $50.00 |
| Wheel Alignment and other work on 6/3/14 | $413.45 |
| Tires Balanced 8/27/14 | $53.50 |
| **Total** | **$730.95** |

Pyskaty Decl., ¶55.

191.    Additionally, Ms. Pyskaty also paid a down payment on the Vehicle of $2,000 at the time of purchase.  Pyskaty Decl., ¶56.

192.    Additionally, Ms. Pyskaty also paid registration of $98 a year and insurance of $1,500 a year on the Vehicle.  As of July 27, 2018, this has totaled $7,990.  Pyskaty Decl., ¶57.

193.    As of July 27, 2018, Ms. Pyskaty has incurred out-of-pocket losses in the amount of $53,652.89.  Pyskaty Decl., ¶58.

194.    In the course of this litigation, Ms. Pyskaty has also incurred significant costs for her automotive expert, Philip J. Grismer, that have been advanced by Plaintiff's counsel.  These

expenses include the costs of the vehicle inspection, creation of the expert report, and preparation and attendance at depositions.  Rothfarb Decl., ¶¶21-26 and Exhibit O.

Dated:  August 3, 2018

/s/*Evan S. Rothfarb*
Evan S. Rothfarb
Daniel A. Schlanger
SCHLANGER LAW GROUP LLP
9 East 40th St., Suite 1300
New York, NY 10016
T: (212) 500-6114
F: (646) 612-7996
erothfarb@consumerprotection.net
dschlanger@consumerprotection.net

*Attorneys for Plaintiff*