UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MAYA PYSKATY,

                   Plaintiff,

       -against-

WIDE WORLD OF CARS, LLC D/B/A WIDE
WORLD BMW and BMW BANK OF NORTH
AMERICA,

                   Defendants.
-------------------------------------------------------------X

**OPINION AND ORDER**

15 Civ. 1600 (JCM)

      Plaintiff Maya Pyskaty ("Plaintiff") commenced this action against Defendants Wide

World of Cars, LLC d/b/a Wide World BMW ("WWC") and BMW Bank of North America

("BMW Bank" and together with WWC "Defendants"). (Docket No. 1).[1]  Before this Court are

(1) WWC's motion for summary judgment, (Docket No. 77); (2) WWC's motion to preclude

Plaintiff's expert, (Docket No. 81); (3) BMW Bank's motion for summary judgment, (Docket

No. 85); and (4) Plaintiff's motion for summary judgment, (Docket No. 90).   For the reasons set

forth below, the Court (1) denies in part and grants in part WWC's motion to preclude Mr.

Grismer's testimony; (2) denies WWC's motion for summary judgment; (3) denies in part and

grants in part BMW Bank's motion for summary; and (4) denies Plaintiff's motion for summary

judgment.

## I.  BACKGROUND

      This case involves a certified pre-owned ("CPO") 2010 BMW 750 LXI, VIN Number

WBAKC8C54ACY68053 (the "Vehicle") purchased by Plaintiff from WWC on October 31,

---

[1] This action is before this Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c).
(Docket No. 11).

2013 and financed by BMW Bank. The following facts are taken from the parties' statements and counter-statements of material facts submitted pursuant to Local Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York and the exhibits submitted by the parties in support of their contentions.

The Certified Pre-Owned BMW Vehicle Program ("CPO Program") is a marketing program designed to capitalize on the consumer demand for pre-owned luxury vehicles. (CPO Program Manual[2] at 3). As set forth in the CPO Program Manual developed by BMW of North America, LLC ("BMW NA"), dealers participating in and implementing the program "are responsible to ensure that vehicles enrolled in the Certified Pre-Owned BMW Vehicle Program and sold as BMW Certified Pre-Owned meet all eligibility requirements, enrollment and inspection standards." (*Id.* at 13). For example, the dealer is responsible for ensuring each CPO vehicle is properly inspected and must complete a CPO vehicle inspection checklist ("Vehicle Inspection Checklist"). (*Id.* at 3). Certain characteristics disqualify vehicles from enrollment in the CPO Program, such as prior commercial use. (*Id.* at 8). Certification is not complete until the dealer completes a Statement of Certification and provides it to the sales department for presentation to the final retail customer. (*Id.* at 10). The CPO Program Manual states that at the time of sale, the dealer should provide the purchaser with a copy of a Statement of Certification. (*Id.*).

On October 31, 2013, Plaintiff visited WWC, an automobile dealership in Spring Valley New York, seeking to purchase a CPO vehicle for her personal use. (Pl. 56.1 ¶ 88; WWC 56.1 ¶ 7). Plaintiff was responding to an advertisement issued by WWC indicating that the CPO designation was awarded "only to those used BMWs that meet our demanding standards and

---

[2] Refers to Exhibit J-11 attached to Plaintiff's motion for summary judgment. (Docket No. 93-11).

pass a meticulous certification process." (Pl. 56.1 ¶ 90). At the dealership, Plaintiff learned that

the vehicle in the advertisement was no longer available. (*Id.* ¶ 91). Plaintiff asked about a

second vehicle at WWC, but a WWC salesperson told Plaintiff the second vehicle was not CPO

but could be certified for an additional $2,000 to $3,000. (*Id.* ¶ 93). Plaintiff declined to

purchase the second vehicle.

As Plaintiff was leaving the dealership, she saw the Vehicle that she ultimately

purchased, which had been marked as a CPO vehicle with labels affixed to the windshield. (*Id.* ¶

97). Plaintiff asked WWC's salesperson, Moon Hasan, about the Vehicle's history and physical

condition, including whether the Vehicle had ever been in an accident. (Pl. 56.1 ¶ 99; BMW

Bank 56.1 ¶ 8; WWC 56.1 ¶ 8). Mr. Hasan informed Plaintiff that the Vehicle had no accident

history and provided Plaintiff with a copy of the CARFAX Vehicle History Report, which

showed no accident history. (Pl. 56.1 ¶ 100; BMW Bank 56.1 ¶ 8; WWC 56.1 ¶ 8). He also told

Plaintiff that the manager had driven the car and determined that it was a good car. (Pl. 56.1 ¶

101; WWC 56.1 ¶ 9).

On October 31, 2013, Plaintiff purchased the Vehicle from WWC for $51,195.00,

excluding taxes and fees. (Pl. 56.1 ¶ 102; BMW 56.1 ¶ 12l; WWC 56.1 ¶ 1). Plaintiff and WWC

executed a Retail Installment Contract, a Purchase Order, and a Buyer/Lessee Delivery

Acknowledgement. (Pl. 56.1 ¶ 103; BMW Bank 56.1 ¶¶ 10, 14; WWC 56.1 ¶¶ 13-16). WWC

also provided Plaintiff with a CARFAX report for the Vehicle, dated October 31, 2013, and a

Buyers Guide. (Pl. 56.1 ¶¶ 104, 105). The Vehicle came with a limited warranty and a CPO

warranty. (Buyers Guide).[3] WWC did not provide Plaintiff with a Vehicle Inspection Checklist,

---

[3] The Buyers Guide is attached as Exhibit M to BMW Bank's motion, (Docket No. 87-13), Exhibit F to WWC's motion, (Docket No. 79-6), and Exhibit J-26 to Plaintiff's motion, (Docket No.93-23).

a Statement of Certification, or damage disclosure notices for the Vehicle at the time of purchase. (Pl. 56.1 ¶¶ 109-11).

Plaintiff financed the Vehicle in part through BMW Bank, and WWC assigned the Retail Installment Contract to BMW Bank. (Pl. 56.1 ¶¶ 112-14). According to Plaintiff, the assignment to BMW Bank was made pursuant to the Federal Trade Commission's ("FTC") Rule on the Preservation of Claims and Defenses ("Holder Rule"), 16 C.F.R. 433.2, as evidenced by the requisite notice in the Retail Installment Contract notifying BMW Bank that "any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of the goods or services obtained pursuant hereto or with the proceeds hereof." (Retail Installment Contract § 19).[4]

Within one week after purchasing the Vehicle, Plaintiff began experiencing issues with the Vehicle. In particular, she claims that the Vehicle began vibrating when she drove it and consumed excessive amounts of oil. (Pl. 56.1 ¶¶ 115-17). As time went on, the Vehicle continued to have problems, including malfunctioning door locks and lack of acceleration. (*Id.* ¶¶ 118-19). Plaintiff took the Vehicle to a local BMW service center on numerous occasions. The service center made some repairs, but the problems with the Vehicle persisted. (*Id.* ¶¶ 117-23). Plaintiff also purchased new tires and rims for the Vehicle, which she claims failed to fix the Vehicle's vibration issues. (*Id.* ¶ 121).

Plaintiff returned to WWC in early June 2014, and WWC provided Plaintiff with a copy of the Vehicle Inspection Checklist. (Pl. 56.1 ¶ 125). Plaintiff informed WWC that she wanted to revoke her acceptance of the Vehicle and arrange for a return, refund and rescission. (*Id.* ¶ 128). WWC stated that it would be willing to take the Vehicle as a trade-in on another vehicle

---

[4] The Retail Installment Contract is attached as Exhibit B to Plaintiff's declaration in support of her motion for summary judgment. (Docket No. 94-2).

that Plaintiff would have to purchase from WWC and indicated that it would value the Vehicle at $35,000 for a trade-in. (*Id.* ¶ 130). Plaintiff declined WWC's offer. (*Id.* ¶ 132).

On June 12, 2014, Plaintiff obtained an AutoCheck Vehicle History Report ("AutoCheck Report") on the Vehicle, which showed that the Vehicle had been in a rear impact collision before Plaintiff purchased it. (Pl. 56.1 ¶ 133-34). The AutoCheck Report also indicated that the Vehicle had been previously used commercially. (*Id.* ¶¶ 135-37). According to Plaintiff, she felt unsafe and uncomfortable driving the Vehicle given its numerous defects. (*Id.* ¶ 171). She took the Vehicle off the road in July of 2014 and has kept it in a garage since that time. (*Id.*).

## II. WWC'S MOTION TO PRECLUDE PLAINTIFF'S EXPERT

WWC moves to preclude the testimony of Plaintiff's expert witness, Phillip Grismer. (Docket No. 81). Specifically, WWC moves to exclude (1) Mr. Grismer's opinion on the Vehicle's mechanical defects, and (2) Mr. Grismer's opinion on the Vehicle's diminished value. (Docket No. 84 at 5, 7).

### A. Legal Standards

Rule 702 of the Federal Rules of Evidence governs the testimony of experts and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. It is a "well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions." *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).

Whether an expert is qualified is a "threshold question" to be resolved by the Court before addressing other inquiries. *Nimely*, 414 F.3d at 400 n. 11. The Federal Rules of Evidence allow opinion testimony by experts when the witness is "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. In analyzing whether a proffered expert is qualified, the Court examines the totality of the expert's qualifications to determine if he or she possesses one or more of the five forms of qualifications identified in Rule 702. *See 523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 642 (S.D.N.Y. 2014). Courts in this Circuit have "liberally construed the qualification requirements of Rule 702, 'at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.'" *Id.* at 642-43 (collecting cases).

After determining that a witness is qualified as an expert to testify, the Court must determine whether the expert's opinion was reached using reliable methodology. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the United States Supreme Court enumerated a non-exhaustive list of factors a court should consider in assessing whether an expert's methods are reliable: (1) whether the method has or could be tested; (2) whether it has been subjected to peer review; (3) its error rate; and (4) the existence and maintenance of standards controlling the method's operation. *Id.* at 593-94. There must be a sufficient analytical connection between the methodology used and the expert's conclusions. Therefore, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).

Finally, the court must assess under Rule 702 whether an expert's testimony will "assist the trier of fact." *Nimely*, 414 F.3d at 397. Expert testimony may not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

## B. Mr. Grismer's Qualifications

The Court first addresses whether Mr. Grismer is qualified to opine on the Vehicle's alleged mechanical defects and diminished value. Plaintiff proffers Mr. Grismer as an expert in the automotive field. (Docket No. 106 at 5). The record shows that Mr. Grismer has extensive experience in the purchase, sale and repair of vehicles. (Grismer Dep.[5] at 11-14, 19-20, 24). He has worked as an automobile inspector and appraiser through his company, PJG Consulting and Appraisals, which has been in operation for 24 years. (*Id.* at 13-15). Mr. Grismer obtained his automotive service excellence ("ASE") technician certification, (*id.* at 7), and he is a certified recreational vehicle inspector and a certified automotive instructor, (*id.* at 7-9).

WWC argues that Mr. Grismer is not qualified because he failed four sections of his ASE recertification test in areas that he is offering testimony. (Docket No. 84 at 6). In response, Plaintiff contends that Mr. Grismer was unable to obtain recertification as a result of his health problems rather than lack of skill or knowledge. Plaintiff further argues that Mr. Grismer's ASE certification is not determinative of whether he possesses the requisite expertise. (Docket No. 106 at 6).

---

[5] Refers to the transcript of Mr. Grismer's deposition, attached as Exhibit Q to WWC's affirmation in support of its motion to exclude Plaintiff's expert. (Docket No. 83-20).

Under the liberal standards of assessing an expert's qualifications, the Court finds that Mr. Grismer is appropriately qualified to render an opinion on the Vehicle's mechanical defects and diminished value. Mr. Grismer has decades of practical experience inspecting and appraising automobiles and has numerous certifications, such as a certification as an automotive instructor issued by the Illinois Board of Education. WWC's objections to Mr. Grismer's ASE recertification go to the weight, not to the admissibility of his testimony, and are more appropriately addressed on cross-examination. *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).

## C. Mr. Grismer's Opinion on the Vehicle's Mechanical Defects

In his initial expert report, Mr. Grismer opined that the vibrations in the Vehicle were the result of defects in the Vehicle's suspension systems and not the result of defective tires. (Docket No. 83-13 at 9). WWC argues that in making this opinion, Mr. Grismer did not use reliable principles and methods because he did not perform a complete road test of the Vehicle and he failed to eliminate other possibilities for the Vehicle's vibrations. (Docket No. 84 at 5-6). Plaintiff responds that Mr. Grismer used many of the same methods utilized by WWC's service manager, including visually inspecting the Vehicle, hoisting the Vehicle to inspect the Vehicle's underside, road testing the Vehicle for three miles, and reviewing WWC's inspection sheets, WWC's post-inspection report, five different repair orders, and reports from CARFAX and Autocheck. (Docket No. 106 at 7).

WWC does not argue that conducting a road test or visual inspection are unreliable methods for ascertaining mechanical defects in automobiles. Indeed, WWC's own expert road tested and visually inspected the Vehicle in forming his opinions. (Docket No. 82 at 9). Rather, WWC argues that in this case Mr. Grismer's methods were not reliable due to incompleteness. (Docket No. 84 at 5-6). For example, WWC claims that the road test was incomplete because

Mr. Grismer was a passenger rather than the driver and because he did not conduct the road test with the aftermarket wheels and tires that WWC maintains should have cured the vibrations. (*Id.* at 6; WWC 56.1 ¶¶ 29, 33). Thus, according to WWC, it was improper for Mr. Grismer to rule out defective wheels and tires as the source of the Vehicle's vibrations.

The Court finds the methods used by Mr. Grismer to be reliable. In his expert report, Mr. Grismer explained his observations during the road test and the results of his visual inspection, and he summarized his review of documents available to him. Mr. Grismer ruled out defective wheels as a cause of the vibrations in part based on the vibrations being felt through the steering wheel, console and the seats on both sides of the vehicle. (Docket No. 83-13 at 9). Mr. Grismer concluded that these types of vibrations were consistent with suspension defects. (*Id.*). He further stated that during the road test he heard a loud metallic bang noise emanating from the rear suspension. (Docket No. 83-13). Mr. Grismer provides an "explanation as to how [he] came to his conclusion and what methodologies or evidence substantiate that conclusion," *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), and Defendants are equipped at trial to "challeng[e] reliable, albeit debatable, expert testimony." *Amorgianos*, 303 F.3d at 267. While WWC and its expert may disagree with the conclusions drawn from Mr. Grismer's road test and visual inspections, that disagreement does not render the methodology unreliable or his expert analysis inadmissible. WWC is free to challenge the weight of the evidence presented by Mr. Grismer to the trier of fact, but the Court will not preclude Mr. Grismer's opinions at this stage.

**D. Mr. Grismer's Opinion on the Vehicle's Diminished Value**

Mr. Grismer concluded that, based on his inspection of the Vehicle and review of its service history, the Vehicle had an actual value of $20,478.00 at the time of purchase. (Docket No. 83-13 at 10). WWC moves to preclude this opinion on the grounds that Mr. Grismer did not

adhere to the standards and techniques typically used by appraisers when appraising the value of a vehicle. (Docket No. 84 at 7-11).

WWC argues that Mr. Grismer should have only considered factors contemplated by valuation guides such as the NADA Kelley Blue Book, Manheim and the Black Book. Specifically, WWC contends that in making deductions to the Vehicle's value, Mr. Grismer should only have considered the "Year, Make, Model and Mileage and overall condition" at the time of sale because these are the only factors considered by the valuation guides. (Docket No. 112 at 15). WWC also claims Mr. Grismer should not have considered repairs made subsequent to the sale. In response, Plaintiff argues that Mr. Grismer was not limited to valuing the Vehicle based on the factors considered by valuation guides, and he was free to draw upon his own experience and expertise in determining the diminished value of the Vehicle. (Docket No. 106 at 9).

Valuation of personal assets is generally done on a case-by-case basis. The Court does not find Mr. Grismer's valuation methodology unreliable simply because he considered factors not used by the valuation guides. While book values provided by industry valuation guides may steer the evaluation of a Vehicle's value, WWC does not cite and the Court does not identify any authority that limits valuation of a particular Vehicle to the valuation guides. Indeed, there may be unique attributes to a vehicle's condition or history that may not be captured by the book value.

In this case, Mr. Grismer explained his methodology and expressly detailed the factors he considered in finding the Vehicle had a diminished value. According to Mr. Grismer, with a sale price of $51,195.00, the Vehicle should have been in excellent condition. (Grismer Report at 1). However, given the Vehicle's history and his observations during the inspection, Mr. Grismer

calculated the Vehicle's fair market value at the time of the purchase by reducing the sale price

by 60%. (Grismer Dep. at 94). At his deposition, the following exchange occurred regarding Mr.

Grismer's method for applying a 60% reduction:

> Q. Now, is there any published guideline book reference material that you use in reaching those percentages that you did here?
>
> A. No, there is an established difference between what is considered excellent, good, fair, poor, that sort of thing, and for the most part, the difference between those categories is roughly 10 to 15 percent.
>
> Q. Are you talking like the NADA Kelley Blue Book and the Black Book conditions for –
>
> A. Each of those valuation guides has parameters that they apply and they are pretty much the same. In the definitions of what is considered excellent, what is considered good, what is considered fair. Most of them, in fact, all of them, do not list anything below that. This is left up to appraiser to do that.

(Grismer Dep. at 96-97). Mr. Grismer explained that he reduced the Vehicle's value by

30% based on the nature of the subsequent repairs, by 20% due to the fact that the Vehicle

had previously been leased commercially, and by 10% based on the Vehicle's paint

conditions at the time of purchase. (*Id.* at 94-95). He explained that he considered repairs

made shortly after the purchase of the Vehicle because they occurred close in time to the

sale. (*Id.* at 82). WWC has credible challenges to why Mr. Grismer reached the conclusions

he did, but in this case, "[v]igorous cross-examination, presentation of contrary evidence,

and careful instruction on the burden of proof" are the appropriate means of "attacking

shaky but admissible evidence." *Amorgianos*, 303 F.3d at 267 (quoting *Daubert*, 509 U.S.

at 596)).

**E. Spoliation of Evidence**

Finally, WWC moves to preclude Mr. Grismer's opinion on the ground that photographs

Mr. Grismer took of the condition of the car during his inspection have been lost by Plaintiff's

counsel and not retained by Mr. Grismer. Plaintiff claims that Mr. Grismer did not retain the

photographs because he provided them to Plaintiff's counsel. (Docket No. 106 at 10). Upon

learning that the photographs were missing, Mr. Grismer took new photographs and served those

photographs with an addendum that the Vehicle's condition had not changed between the time of

the original inspection and the subsequent inspection. (*Id.*). Plaintiff offers no explanation for

how or why her counsel lost the original photographs.

"Spoliation refers to the destruction or material alteration of evidence or to the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 410 (S.D.N.Y. Apr. 27, 2010) (citation

and internal quotation marks omitted). "The right to impose sanctions for spoliation arises from

a court's inherent power to control the judicial process and litigation, but the power is limited to

that necessary to redress conduct 'which abuses the judicial process.'" *Id.* (citation omitted).

"Before the extreme sanction of preclusion may be used by the district court, a judge should

inquire more fully into the actual difficulties which the violation causes, and must consider less

drastic responses." *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., Ltd.*, 769 F.

Supp. 2d 269, 278 (S.D.N.Y. 2011) (citation and internal quotation marks omitted).

A party seeking spoliation sanctions must demonstrate:

> (1) that the party having control over the evidence had an obligation to preserve
> it at the time it was destroyed; (2) that the records were destroyed with a
> "culpable state of mind" and (3) that the destroyed evidence was "relevant" to
> the party's claim or defense such that a reasonable trier of fact could find that
> it would support that claim or defense.

*Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 430 (S.D.N.Y. 2004). The duty to

"preserve evidence arises when the party has notice that the evidence is relevant to

litigation or when a party should have known that the evidence may be relevant to future

litigation." *United States v. Barnes*, 411 Fed. Appx. 365, 368 (2d Cir. 2011) (citation and internal quotation marks omitted). First, Plaintiff and Mr. Grismer had a duty to preserve the photographs Mr. Grismer took in connection with his inspection as they should have anticipated litigation at the time of the initial inspection. Mr. Grismer also provided the photographs to Plaintiff's counsel, signaling that litigation was either underway or imminent. Moreover, Mr. Grismer cited to the photographs in his expert report as corroborative evidence of his conclusions that have been used in this litigation. (Grismer Report at 2).

Second, for purposes of spoliation a "culpable state of mind" includes ordinary negligence. *Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 438 (S.D.N.Y. 2010); *see also Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (sanctions "should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference."). Here, Plaintiff offers no explanation for why the photographs provided to her counsel were lost or what efforts were made to locate the original photographs. It is not clear if the photographs were lost in transit or if Plaintiff obtained the photographs and then misplaced them. Although there is insufficient evidence before the Court to find bad faith, counsel's inability to locate the photographs without explanation constitutes ordinary negligence.

Third, the Court finds that the photographs would be relevant to WWC's claims or defenses because Mr. Grismer cited the photographs in support of his conclusions. (Grismer Report at 2). WWC should have been free to review the photographs to confirm Mr. Grismer's statements and, if appropriate, use the photographs to challenge the accuracy of Mr. Grismer's observations and conclusions. However, by not being provided with the

contemporaneous photographs, WWC lost the opportunity to challenge evidence created by Mr. Grismer that he then used in support of his opinion.

Based on the findings here, the Court has considerable discretion in fashioning the appropriate remedy. *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir. 1999). While WWC seeks preclusion of Mr. Grismer's testimony, the Court finds that this sanction is not appropriate under these circumstances. Indeed, "severe sanctions should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 501 (S.D.N.Y. 2016) (citation and internal quotation marks omitted); *see also Passlogix*, 708 F. Supp. 2d at 421 ("Preclusion is a harsh sanction preserved for exceptional cases where a . . . party's failure to provide the requested discovery results in prejudice to the requesting party.") (citation and internal quotation marks omitted). Instead of precluding Mr. Grismer from testifying, the Court will permit WWC to offer evidence of the spoliation at trial and the jury will be permitted, but not required, to draw an adverse inference based on the missing evidence. *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 383-84 (2d Cir. 2001) (jury charge "permitting an adverse inference was fully warranted" based on a party's spoliation of evidence). Furthermore, the Court will preclude Mr. Grismer from representing that the photographs included in his supplemental report, which were taken years after his inspection, were identical to the original photographs. WWC, and the Court, have no way of comparing the two sets of photographs, and as an appropriate sanction for the loss of the original photographs, Mr. Grismer is not permitted to represent that the subsequent photographs, taken approximately three years after the initial inspection, are identical.

## III. DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Defendants move for summary judgment on the following claims: breach of the implied warranty of merchantability under the Magnuson-Moss Warranty Act ("MMWA") and N.Y. U.C.C. § 2-314, breach of express written warranty under the MMWA and N.Y. U.C.C. § 2-313, violations of New York General Business Law § 349 and § 350, and common law fraud. After discussing the applicable legal standards, the Court will address each claim in turn.

### A. Legal Standards

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The moving party has the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (citation and internal quotation marks omitted). A fact is "material" if it might "affect the outcome of the suit under the governing law." *Id.*

In considering a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation and internal quotation marks omitted). However, the nonmovant cannot defeat a motion for summary judgment by relying on unsupported assertions, conjecture or surmise. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). The nonmovant must also do more than show that there is "some metaphysical doubt as to the

material facts." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To survive a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467-68 (S.D.N.Y. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986)).

**B.  Breach of Express Warranty under the New York Uniform Commercial Code**

"'Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.'" *Sitt v. Nature's Bounty, Inc.*, No. 15-CV-4199 (MKB), 2016 WL 5372794, at *15 (E.D.N.Y. Sept. 26, 2016) (quoting N.Y. U.C.C. § 2-313(1)(b)); *see also Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 482 (S.D.N.Y. 2014) ("Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.") (citation and internal quotation marks omitted).  Under New York law, a breach of express warranty claim requires "(1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by the breach." *Id.*  While a seller need not use words such as "warrant" or "guarantee" to create an express warranty, "[g]eneralized statements by a defendant, however, do not support an express warranty claim if they are such that a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely." *Sitt*, 2016 WL 5372794, at *15 (citations and internal quotation marks omitted).

WWC argues that Plaintiff failed to raise triable issues as to the existence of an express warranty or a breach of said warranty. (Docket No. 80 at 7-11).  BMW Bank argues that because

the claim against WWC fails, the claim against BMW Bank, as assignee, also fails. (Docket No. 89 at 11-16).

The Court finds that Plaintiff has raised triable issues of fact as to her breach of express warranty claim under New York law. Plaintiff sets forth sufficient evidence that she purchased the Vehicle based on WWC's representation that the Vehicle was CPO, and therefore met the eligibility requirements of BMW's CPO Program. As evidence of the existence of an express warranty, Plaintiff points to the labels affixed on the Vehicle's windshield indicating that it was a CPO vehicle, WWC's advertisements that CPO vehicles undergo a certification process, WWC's agent's representations that the Vehicle was CPO, a representation in the Buyers Guide that the Vehicle came with a CPO warranty, and WWC's sale of the Vehicle pursuant to a deal only afforded to CPO vehicles. (Docket No. 102 at 9-12). *See, e.g.*, *Goldemberg*, 8 F. Supp. 3d at 482-83 (labels and advertising conveying factual promises about a product can give rise to an actionable breach of express warranty claim); *Sitt*, 2016 WL 5372794, at *17 (seller's representations in "sales materials and advertisements" formed a basis for plaintiff's breach of express warranty claim). A reasonable juror could find that WWC's decision to market the Vehicle with a CPO designation indicated to Plaintiff that the vehicle she was purchasing had undergone the requisite inspection, conformed with the requirements of the CPO Program Manual, and met the eligibility requirements for the program.

Plaintiff also adduced evidence that WWC may have breached the express warranty it created by marketing the Vehicle as CPO. On this point, Defendants argue that there can be no breach because it is undisputed that BMW NA honored the CPO warranty. (Docket No. 89 at 12-13). The fact that BMW NA may have honored the CPO warranty does not dispose of Plaintiff's claim because a reasonable juror could find that the "CPO" designation misled Plaintiff about the

history of the Vehicle and is objective qualities.  For example, a reasonable consumer could interpret the representation that a vehicle is "Certified Pre-Owned" or "CPO" as a factual representation that the vehicle had undergone the proper certification process before receiving its designation and possessed the specific attributes required for certification.  Here, Plaintiff presents evidence that the Vehicle had a prior history of commercial use, which rendered it ineligible for a CPO designation.  Plaintiff also presented evidence that WWC was aware of the Vehicle's prior commercial use at the time it designated the Vehicle as CPO because it was in possession of a disqualifying CARFAX Report.  This evidence is sufficient to create a genuine issue of material fact on Plaintiff's breach of express warranty claim under New York law.

Defendants further argue that they cannot be held liable in connection with the CPO Program as a matter of law because the CPO Program is administered by a separate entity, BMW NA, a non-party to this litigation. (Docket No. 89 at 12; Docket No. 116 at 8).  This argument is unavailing.  The CPO Program Manual places the onus on WWC, as the dealer selling CPO vehicles, to conduct inspections and ensure each vehicle sold as CPO meets the standards and eligibility requirements of the program.  WWC is the entity that completed the Vehicle Inspection Checklist and presented the Vehicle as CPO when marketing it to potential customers. WWC also specifically represented that the Vehicle was a CPO vehicle to Plaintiff as evidenced by the labels on the Vehicle at the time Plaintiff purchased it and the representation in the Buyers Guide that the Vehicle came with a CPO warranty.

Finally, BMW Bank cannot escape liability on summary judgment because, as the assignee, it "stands in the shoes of its assignor and takes subject to those liabilities of its assignor that were in existence prior to the assignment . . ." *Pierre v. Planet Automotive, Inc.*, 193 F.

Supp. 3d 157, 176 (E.D.N.Y. 2016) (quoting *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011)).

Accordingly, Defendants' motion for summary judgment as to Count III, the breach of express warranty claim under New York law, is denied.

## C.  Breach of Express Warranty under the MMWA

The MMWA affords recourse to consumers damaged by a warrantor's failure to comply with its obligations under a written warranty. *See Wilbur v. Toyota Motor Sales, U.S.A., Inc.*, 86 F.3d 23, 26 (2d Cir. 1996).  It "is a remedial statute designed to protect consumers against deceptive warranty practices." *Ray v. Samsung Electronics Am., Inc.*, No. 15-cv-8540 (DLC), 2016 WL 3406127, at *7 (S.D.N.Y. June 17, 2016) (citations and internal quotations omitted).  A written warranty under the MMWA is defined as:

> (A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or
>
> (B) any undertaking in writing in connection with the sale by a supplier of a consumer product to a buyer to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking,
>
> which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.

15 U.S.C. § 2301(6).  The MMWA "incorporates and federalizes state-law breach of warranty claims, including state-law standards for liability and damages." *Ebin v. Kangadis Food Inc.*, No. 13 Civ. 2311 (JSR), 2013 WL 3936193, at *3 n. 2 (S.D.N.Y. July 26, 2013); *see also Diaz v. Paragon Motors of Woodside, Inc.*, 424 F. Supp. 2d 519, 540 (E.D.N.Y.

2006) ("The MMWA . . . creates no additional bases for liability, but allows a consumer to recover damages under existing state law, and attorneys fees.").

Plaintiff concedes that Section 2310(f) of the MMWA bars her breach of express warranty claim premised on the MMWA against BMW Bank. (Docket No. 102 at 27-28). Generally, the Holder Rule[6] preserves a consumer's right to assert the legal claims and defenses against the assignee of a credit contract that the consumer could have asserted against the assignor. *See Diaz*, 424 F. Supp. 2d at 543. In tension with the Holder Rule, Section 2310(f) circumscribes MMWA liability for breach of express warranty to "the warrantor actually making a written affirmation of fact, promise or undertaking" and limits enforcement "against such warrantor and no other person." Given Plaintiff's agreement to withdraw its MMWA breach of express warranty claim against BMW Bank, the Court will dismiss Count II against BMW Bank.

As for the MMWA claim against WWC, for the reasons discussed above, Plaintiff has raised triable issues of fact as to the existence and breach of an express warranty, and WWC's motion for summary judgment on Count II is denied. *See* Section III.B, *supra*.

## D. Breach of Implied Warranty Under the MMWA and New York Law

The MMWA defines "implied warranty" as "an implied warranty arising under State law . . . in connection with the sale by a supplier of a consumer good." 15 U.S.C. § 2301(7). In this case, the implied warranty of merchantability under N.Y. U.C.C. § 2-314 requires that the product sold be reasonably fit for the ordinary purpose for which it was intended. Under New York law, at a bare minimum the ordinary purpose for a used car is to "enable the purchaser to

---

[6] The FTC's Holder Rule requires all consumer installment contracts to contain the following provision: "Notice: Any holder of this consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained pursuant hereto or with the proceeds hereof. Recovery hereunder by the debtor shall not exceed amounts paid by the debtor hereunder." 16 C.F.R. § 433.2(a).

transport herself upon the streets and highways of this state or any other in a reasonably safe manner." *Diaz*, 424 F. Supp. 2d at 541 (citation omitted). An implied warranty provides for a "minimal level of quality" and "arises automatically in every sale of goods by one who is a merchant in those goods." *Meserole v. Sony Corp. of Am., Inc.*, No. 08 CV 8987 (RPP), 2009 WL 1403933, at *8 (S.D.N.Y. May 19, 2009) (citation and internal quotation marks omitted). Plaintiff argues that the Vehicle would not pass without objection in the trade and defects in the Vehicle rendered it unfit for the purpose of safe transportation.

## 1. Claim Asserted Against BMW Bank

BMW Bank argues that it cannot be held liable for breach of implied warranty as a matter of law because it is not in privity with Plaintiff. (Docket No. 89 at 19). In response, Plaintiff maintains that the FTC's Holder Rule, 16 C.F.R. § 433.2, and its New York State analog, N.Y. Personal Property Law § 302(9), make BMW Bank, as the current holder of the Retail Installment Contract, liable for WWC's misconduct, including breach of implied warranty. (Docket No. 102 at 26). Plaintiff further argues that the MMWA does not contain any provision barring breach of implied warranty claims against an assignee. (*Id.* at 27-28).

BMW Bank relies upon the well-established principle in New York that, absent privity, a plaintiff cannot recover damages for economic loss based upon breach of implied warranty. *See Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 556 (S.D.N.Y. 2016) ("New York courts continue to require privity between a plaintiff and defendant with respect to claims for breach of the implied warranties of merchantability and fitness for a particular purpose where the only loss alleged is economic."). The privity requirement also applies to implied warranty claims brought under the MMWA. *See Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 249 (2d Cir. 1986) ("[W]e believe that state law, including privity requirements, governs implied warranties except where explicitly modified by Sections 2308 and 2304(a)").

Plaintiff relies upon the Holder Rule, a regulation promulgated by the FTC, and its New York state analog. *See* 16 C.F.R. § 433.2; N.Y. Personal Property Law § 302(9). The FTC's Holder Rule "preserves a consumer's right to assert the same legal claims and defenses against the assignee of a credit contract as that consumer could have asserted against the assignor." *Pierre*, 193 F. Supp. 3d at 174; *see also Diaz*, 424 F. Supp. 2d at 543-44. New York's Personal Property Law § 302(9) similarly preserves "consumer claims and defenses by mandating that '[a]ny holder of [a] consumer credit contract is subject to all claims and defenses which the debtor could assert against the seller of goods or services obtained.'" *Ramirez v. Nat'l Co-op. Bank (NCB)*, 938 N.Y.S.2d 280, 280 (1st Dep't 2011).

The Court will first address Plaintiff's claim for breach of implied warranty arising under New York law. The Retail Installment Contract in this case contains the requisite provision putting BMW Bank on notice that it is "subject to all claims and defenses" Plaintiff could assert against WWC. (Retail Installment Contract § 19). Neither BMW Bank nor WWC have raised lack of privity as a defense against Plaintiff's claim against WWC. Thus, because Plaintiff has an actionable claim for breach of implied warranty against WWC (*see* Section III.D.2-3, *infra*), the FTC's Holder Rule and its New York state analog preserve Plaintiff's ability to bring her validly asserted breach of implied warranty claim against BMW Bank under New York law.

The survival of Plaintiff's claim for breach of implied warranty premised on the MMWA necessitates additional analysis. Cases addressing whether the MMWA permits assignee liability have resulted in different outcomes. Relying upon the Holder Rule, the court in *Diaz v. Paragon Motors of Woodside*, 424 F. Supp. 2d 519 (E.D.N.Y. 2006) permitted the plaintiff's claim for breach of implied warranty under the MMWA against the assignee as the holder of the applicable consumer installment contract. *Id.* at 544. The court in *Dees v. Bob O'Connor Ford,*

*Inc.*, No. 94 C. 7083, 1995 WL 441629 (N.D. Ill. July 20, 1995) reached a similar result when it

found that the Holder Rule's notice provisions in the retail installment contract allowed "plaintiff

as a consumer, to assert claims against [the] assignee-creditor, including breach of warranty

claims [under the MMWA] which previously have only been asserted against a seller . . ." *Id.* at

*3. In contrast, the court in *Pierre* concluded that the limitation contained in section 2310(f) of

the MMWA expressly prohibited assignee liability under the MMWA, notwithstanding the

mandate of the Holder Rule. 193 F. Supp. 3d at 175. Plaintiff argues that the statutory provision

relied upon in *Pierre* only applies to written warranties under the MMWA, not implied

warranties, and therefore the *Pierre* holding and section 2310(f) do not foreclose BMW Bank's

liability for breach of implied warranty under the MMWA. (Docket No. 102 at 27-28).

Any analysis of liability under the MMWA begins with the plain text of the statute. *See K*

*Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the

statute, the court must look to the particular statutory language at issue, as well as the language

and design of the statute as a whole."). Thus, the Court will first determine whether the plain

language of the MMWA limits assignee liability in breach of express warranty claims only,

while still allowing assignee liability for other violations of the MMWA.

The MMWA distinguishes between warranties created through written warranties (*see* 15

U.S.C. § 2301(6)) and implied warranties (*see id.* § 2301(7)). Section 2310(f) limits liability as

follows:

> For purposes of this section, only the warrantor actually making a written
> affirmation of fact, promise, or undertaking shall be deemed to have created
> a written warranty, and any rights arising thereunder may be enforced under this
> section only against such warrantor and no other person.

 15 U.S.C. § 2310(f). Plaintiff correctly asserts that there is no comparable limitation on liability

for those charged with breaching an implied warranty arising under state law. It is a canon of

statutory interpretation that "the express mention of one thing excludes all others," meaning that Congress' limitation of assignee liability for breach of written warranties (and only written warranties) does not permit an inference that Congress also intended to limit assignee liability for breach of implied warranties. *See Rivas v. Fischer*, 687 F.3d 514, 551 (2d Cir. 2012) (interpreting list of available statutory exceptions in a federal statute based on the doctrine of "*expressio unius est exclusio alterius* (express mention of one thing excludes all others)"). Accordingly, the Court agrees with Plaintiff's interpretation of the reach of section 2310(f), and declines to find that its limitation bars assignee liability for breach of implied warranty claims.

Given the Holder Rule's express mandate that assignees are subject to all claims a purchaser can bring against the seller, and the absence of a provision in the MMWA expressly limiting assignee liability for breach of implied warranty, the Court denies BMW Bank's motion for summary judgment on Count I.

## 2. Existence of an Implied Warranty

Defendants argue that WWC effectively disclaimed any implied warranties associated with the sale of the Vehicle. (Docket No. 80 at 16; Docket No. 89 at 16-18). Plaintiff contends that because WWC provided Plaintiff with written warranties, it is barred from disclaiming implied warranties. (Docket No. 102 at 18-19). Plaintiff further argues that the Retail Installment Contract expressly provides for implied warranties, and any conflict between the terms of the Retail Installment Contract and the Purchase Order should be construed in Plaintiff's favor. (*Id.* at 19-20).

"Congress passed the MMWA 'to restrict the ability of sellers to disclaim the warranties implied under state law.'" *Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 232 (S.D.N.Y. 2015) (quoting *Abraham*, 795 F.2d at 247). In particular, the MMWA prohibits a seller from disclaiming or modifying "any implied warranty to a consumer with respect to such consumer

product if (1) such supplier makes any written warranty to the consumer with respect to such

consumer product, or (2) at the time of sale, or within 90 days thereafter, such supplier enters

into a service contract with the consumer which applies to such consumer product." 15 U.S.C. §

2308(a). However, an implied warranty may be "limited in duration to the duration of a written

warranty of reasonable duration, if such limitation is conscionable and is set forth in clear and

unmistakable language and prominently displayed on the face of the warranty." *Id.* § 2308(b).

Any disclaimer made in violation of the MMWA is deemed ineffective. *Id.* § 2308(c).

In this case, Defendants rely on the following disclaimer contained in the Purchase Order

as evidence that WWC purportedly disclaimed all implied warranties:

> Disclaimer of Warranties. DEALER MAKES NO WARRANTIES, EXPRESS OR
> IMPLIED, REGARDING THE VEHICLE AND THERE ARE NO IMPLIED
> WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A
> PARTICULAR PURPOSE. HOWEVER, THIS PROVISION DOES NOT
> AFFECT (1) ANY WARRANTIES COVERING THE VEHICLE THAT THE
> MANUFACTURER OR SUPPLIER MAY PROVIDE, (2) DOES NOT LIMIT
> ANY IMPLIED OR OTHER WARRANTIES IMPOSED AS A MATTER OF
> LAW (e.g. LEMON LAWS) AND (3) DOES NOT LIMIT ANY WARRANTY
> DESCRIBED IN THIS AGREEMENT OR IN A SEPARATE WRITING GIVEN
> IN CONNECTION WITH THIS TRANSACTION. ADDITIONALLY, EXCEPT
> AS REQUIRED BY LAW, DEALER IS NOT LIABLE FOR INCIDENTAL OR
> CONSEQUENTIAL DAMAGES RESULTING FROM THE SALE OF THIS
> VEHICLE.

(Purchase Order § 8).[7] The Purchase Order's disclaimer notably does not disclaim warranties (1)

supplied by the manufacturer or supplier, (2) provided by law, or (3) provided to Plaintiff in a

separate writing in connection with the transaction. (*Id.*) Thus, by the plain terms of WWC's

disclaimer, WWC has not disclaimed the express written warranties it provided to Plaintiff in the

Buyers Guide, including the limited warranty or the CPO warranty, or implied warranties

preserved by state law or the MMWA. In this case, because WWC provided Plaintiff with a

---

[7] The Purchase Order is attached as Exhibit E to WWC's motion, (Docket No. 79-5), and Exhibit C to BMW Bank's motion, (Docket No. 87-3).

limited warranty, the MMWA prohibits WWC from disclaiming implied warranties for the duration of the limited warranty. *See Abraham*, 795 F.2d at 247-48 ("Several sections of the [MMWA] thus ensure that a consumer with a written warranty also enjoys implied warranty protection . . . A seller is thus still free to offer a relatively worthless written warranty . . . but by doing so is barred from disclaiming implied warranties arising under state law.").

Moreover, the disclaimer contained in the Purchase Order does not, by its own terms, affect the preservation of implied warranties contained in the Retail Installment Contract. Section 15 of the Retail Installment Contract provides that "[i]f Seller extends, or the Vehicle's manufacturer extends, a written warranty or service contract covering the Vehicle within 90 days from the date of this Contract, [Plaintiff] get[s] implied warranties of merchantability and fitness for a particular purpose covering the Vehicle." (Retail Installment Contract § 15). As discussed above, the Buyers Guide, provided to Plaintiff in connection with the sale of the Vehicle, indicates that the Vehicle was subject to both a limited warranty and a CPO warranty. The written warranties in the Buyers Guide triggered the implied warranties contemplated within the Retail Installment Contract and do not conflict with the disclaimer in the Purchase Order, which expressly preserves "any warranty described . . . in a separate writing given in connection with this transaction." (Purchase Order § 8). Accordingly, the Court finds that summary judgment in Defendants' favor on the ground that WWC disclaimed implied warranties is not warranted.

**3. Breach of an Implied Warranty**

Triable issues of fact exist as to whether the Vehicle sold to Plaintiff violated the implied warranty of merchantability. Plaintiff presents evidence that the Vehicle would not pass without objection in the trade and had defects that rendered it unsafe and unfit for driving as early as one week after the sale. Plaintiff relies upon her own firsthand knowledge of the Vehicle's performance as well as the expert testimony of Mr. Grismer. Conversely, Defendants present

evidence that the Vehicle performed as warranted and any alleged defects were the result of Plaintiff's misuse of the Vehicle. Resolution of these factual disputes is not appropriate for summary judgment. Thus, Defendants' motions for summary judgment on Counts I and IV are denied.

### E. Common Law Fraud

Under New York law, common law fraud requires "a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, 81 N.Y.S.3d 816, 822 (2018). Findings of fraudulent intent and reasonable reliance are often fact-specific inquiries left for a jury to decide. *See Banque Nationale de Paris v. Prudential Sec., Inc.*, No. 95 CIV. 0990 (DC), 1997 WL 639257, at *2 (S.D.N.Y. Oct. 16, 1997) ("[F]indings as to fraudulent intent are peculiarly fact-intensive and an affirmative finding can rarely be made as a matter of law.") (citation and internal quotation marks omitted); *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, No. 02-CV-8881 (JPO), 2018 WL 4682783, at *5 (S.D.N.Y. Sept. 28, 2018) ("Reasonable reliance is therefore a question normally reserved for the finder of fact and not usually amenable to summary judgment.") (citation and internal quotation marks omitted).

Defendants argue that the fraud claim fails because there is no evidence that WWC knew the CARFAX report provided to Plaintiff was inaccurate or that WWC was aware the Vehicle had prior accident damage. (Docket No. 80 at 16-17; Docket No. 89 at 22-23). Defendants further argue that WWC disclaimed the reliability of the information contained in the CARFAX report. (Docket No. 80 at 17; Docket No. 89 at 22). Plaintiff maintains that the crux of her fraud

claim is that "WWC represented and sold the Vehicle to [Plaintiff] as CPO when it did not

qualify for the CPO program." (Docket No. 102 at 25). Plaintiff also contends that Mr. Hasan's

representations to Plaintiff that the Vehicle was "accident free," "perfect" and a "good car"

create triable issues of fact that preclude summary judgment. (*Id.*).

Evidence that WWC sold the Vehicle as CPO despite being in possession of a

disqualifying CARFAX Report raises a genuine issue of material fact. Defendants' argument

that they cannot be responsible for false information in the CARFAX Report misses the thrust of

Plaintiff's argument. In this case, the CARFAX Report in WWC's possession showed that the

Vehicle had prior commercial use, rendering it ineligible for the CPO Program. The evidence

shows that WWC nonetheless marketed and sold the Vehicle with a CPO designation. The Court

notes that WWC provided Plaintiff with a copy of the CARFAX Report, which raises a question

over whether it was appropriate for Plaintiff to reasonably rely upon WWC's representation that

the Vehicle met the CPO Program's eligibility requirements. That is a question for a jury,

however, and not for the Court to decide. *See Silvercreek*, 2018 WL 4682783, at *5.

Moreover, there is a factual dispute as to whether Mr. Hasan, WWC's salesperson,

independently verified that the Vehicle was accident-free or if he simply provided Plaintiff with

the CARFAX Report, which inaccurately showed that the Vehicle had no prior accident history.

Plaintiff claims that Mr. Hasan affirmatively represented that the Vehicle was accident-free, even

though the Vehicle had previously been in a rear-end collision.[8] In contrast, Defendants take the

position that Mr. Hasan merely provided Plaintiff with a copy of the CARFAX Report, which

---

[8] BMW Bank argues that Plaintiff made this factual contention for the first time in her summary judgment affidavit, contradicting her deposition testimony. (Docket No. 113 at 11-12). A court may disregard an affidavit submitted in opposition to summary judgment if it "by omission or addition, contradicts the affiant's previous deposition testimony." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014). In this case, Plaintiff's affidavit expands upon her interactions with Mr. Hasan and does not clearly contradict her prior testimony. Accordingly, the Court will consider Plaintiff's affidavit on summary judgment.

WWC specifically disclaimed the accuracy of. Resolution of the parties' conflicting factual accounts is for the fact finder in this case.

Accordingly, fact questions preclude summary judgment on the common law fraud claim.

## F. New York General Business Law § 349 and § 350

New York General Business Law § 349 ("GBL § 349") makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [the State of New York]." GBL § 349 "is a broad, remedial statute" and "the provision creating a private right of action employs expansive language." *Blue Cross & Blue Shield of N.J., Inc v. Philip Morris USA Inc.*, 785 N.Y.S.2d 399, 403 (2004). Accordingly, GBL § 349 applies to "virtually all economic activity," and its application is correspondingly broad in order to "provide[] needed authority to cope with the numerous, ever-changing types of false and deceptive business practices which plague consumers in [New York] State." *Karlin v. IVF Am., Inc.*, 690 N.Y.S. 2d 495, 498 (1999) (citation and internal quotation marks omitted). To demonstrate a GBL § 349 claim, a plaintiff must prove that a defendant engaged in "(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (citation and internal quotation marks omitted).

New York General Business Law § 350 ("GBL § 350") declares unlawful "false advertising in the conduct of any business, trade, or commerce in the furnishing of any service" in the State of New York. False advertising is defined as advertising that is "misleading in a material respect." GBL § 350(a)(1). "The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349." *New World Solutions, Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 330 (S.D.N.Y. 2015).

Defendants argue that Plaintiff's claims under the GBL amount to nothing more than an isolated dispute between the parties, and Plaintiff has not presented evidence of a pattern of recurring misconduct that impacts the public at large. (Docket No. 80 at 18-19; Docket No. 89 at 20). Plaintiff maintains that WWC's actions were "consumer-oriented" within the meaning of the statute because WWC held the Vehicle out to the consuming public as CPO. (Docket No. 102 at 21-22).

Plaintiff argues correctly that a pattern of deception is not necessary for a GBL § 349 or a § 350 claim to survive. *See also Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995) ("Consumer-oriented conduct does not require a repetition or pattern of deceptive behavior. The statute itself does not require recurring conduct."). Instead, a plaintiff bringing a GBL § 349 or § 350 claim must demonstrate that "the disputed acts or practices have a broader impact on consumers at large" though the statute "does not necessarily require repetition or a pattern of deceptive behavior." *Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 447 (S.D.N.Y. 2004); *see also Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) ("It is clear that 'the gravamen of [the claim] must be consumer injury or harm to the public interest.'") (citation omitted). "Private contract disputes, unique to the parties . . . would not fall within the ambit of the statute." *Oswego*, 85 N.Y.2d at 25.[9]

---

[9] WWC cites *New York Univ. v. Continental Ins. Co.*, 87 N.Y.2d 308 (1995) for the proposition that Plaintiff must establish a pattern of a deceptive practice aimed at the public at large. The *New York University* case states that a plaintiff must demonstrate a pattern of misconduct in order to demonstrate a claim for punitive damages arising out of a breach of contract. *Id.* at 316. On the contrary, WWC's cited case recognizes that conduct that gives rise to a GBL § 349 violation "need not be repetitive or recurring but defendant's acts or practices must have a broad impact on consumers at large." *Id.* at 320. BMW Bank relies upon the Second Circuit's earlier decision in this case, which found that WWC's alleged conduct is "more akin to 'an isolated transaction incident to an otherwise legitimate business' than 'a gross and wanton fraud upon the public.'" *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 226 (2d Cir. 2017) (citing *Pyskaty v. Wide World of Cars, LLC*, 15 Civ. 1600 (JCM), 2016 WL 828135, at *7 (S.D.N.Y. Feb. 26, 2016)). The Second Circuit's decision was inapposite to the issue presented here as it was in reference to whether Plaintiff's claim for punitive damages was warranted, and not whether WWC's conduct was "consumer-

"Courts have traditionally applied General Business Law § 349 in the context of consumer sales transactions." *Teller v. Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 773 (2d Dep't 1995). "The typical violation contemplated by the statute involves an individual consumer who falls victim to misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising." *Id.* (citation and internal quotation marks omitted). In *Oswego*, the New York Court of Appeals found that a defendant bank engaged in consumer-oriented conduct because the bank treated the plaintiffs "as any customer entering the bank to open a savings account, furnishing the[m] with standard documents presented to customers upon the opening of accounts." *Oswego*, 85 N.Y.2d at 26. The account openings at the center of the dispute were not "unique" to the parties, "private in nature," or a "single shot transaction." *Id.* In contrast, in *New York University v. Continental Ins. Co.*, 87 N.Y.2d 308 (1995), the Court of Appeals distinguished *Oswego* on its facts. There, the Court found that an insurance provider was not liable under GBL § 349 based on its denial of commercial liability coverage to New York University because the disputed insurance policy "was not a standard policy" and the "'private' contract dispute over policy coverage and the processing of a claim" was unique to the individual parties. *Id.* at 321.

In this case, Plaintiff has sufficiently demonstrated that WWC's actions were consumer-oriented. The CPO Program and the dealers who participate in it do so in an effort to capitalize upon consumer demand for pre-owned luxury vehicles and Plaintiff came to WWC in response to an advertisement extolling the benefits of CPO vehicles. WWC's representations concerning

oriented" within the meaning of New York's GBL statute. The standard for punitive damages and the standard for "consumer-oriented" conduct are not equivalent, and the Court will not graft the stringent requirements for punitive damages onto the broad protections afforded by New York's consumer protection statute.

the CPO eligibility of its vehicles and its conduct in implementing the CPO Program have the potential to affect other buyers who seek CPO vehicles from WWC.

Triable issues of fact exist as to whether WWC abided by the appropriate procedures during the certification process before marketing the Vehicle as CPO, barring summary judgment on the GBL claims. For example, in Plaintiff's case, WWC did not account for a disqualifying CARFAX Report that, per the terms of the CPO Program Manual, should have rendered the Vehicle ineligible for a CPO designation. Plaintiff has also adduced evidence that the Vehicle Inspection Checklist, which is a prerequisite to certification, contained inaccurate information. (*Compare* Docket No. 93-22 (Vehicle Inspection Checklist) with Docket No. 79-10 (10/31/2013 CARFAX Report)). Moreover, WWC did not provide Plaintiff with the CPO materials at the time of purchase, including the Statement of Certification, the Vehicle Inspection Checklist, or damage disclosure notices. (Docket No. 94 ¶¶ 21-23). With respect to the certification process generally, Plaintiff has presented evidence that WWC used an untrained individual to complete the Vehicle Inspection Checklist as a "Service Advisor." (Jackson Dep.[10] at 46-51, 55, 57-58) These facts, among others, allow the GBL § 349 and § 350 claims to survive summary judgment.

## IV. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff moves for summary judgment on the following claims: breach of implied warranty under the MMWA and New York law, breach of express warranty under New York law, and violations of sections 349 and 350 of the New York General Business Law. Plaintiff seeks to revoke her acceptance of the Vehicle and rescission.

---

[10] Refers to excerpts from the deposition transcript of Michael Jackson, dated April 12, 2018. (Docket No. 93-7).

## A. Breach of Implied Warranty under the MMWA and New York Law

As discussed above in Section III.D.3, genuine issues of material fact preclude summary judgment on Plaintiff's claim for breach of implied warranty under the MMWA and New York law. There is a factual dispute over the nature and extent of the Vehicle's problems and whether those problems amounted to a breach of the implied warranty of merchantability. Plaintiff maintains that the Vehicle possessed mechanical defects that rendered it unsafe to drive and adduced evidence to that effect through expert testimony and her own personal knowledge. On the other hand, WWC's expert observed during a road test that the Vehicle ran smoothly once it was fitted with proper tires, and Defendants maintain that the Vehicle performed as warranted. Thus, whether the Vehicle was fit for its ordinary purpose is an issue for the jury and the Court denies Plaintiff's motion for summary judgment on the breach of implied warranty claims.

## B. Breach of Express Warranty Under New York Law

Plaintiff moves for summary judgment on her breach of express warranty claim under New York law. (Docket No. 92 at 14-16). Plaintiff maintains that there is no factual dispute concerning the Vehicle's condition, its CPO qualifications, or Plaintiff's reasonable reliance on WWC's representation that the Vehicle was CPO. (*Id.* at 15). Defendants contest both the existence of an express warranty and a breach of said warranty. (Docket No. 98 at 11-16; Docket No. 100 at 21-22).

In order for an express warranty to exist, "there must be an affirmation of fact or promise by the seller, the natural tendency of which is to induce the buyer to purchase." *Daley v. McNeil Consumer Prods. Co.*, 164 F. Supp. 2d 367, 376 (S.D.N.Y. 2001). "Generalized statements by the defendant, however, do not support an express warranty claim if they are 'such that a reasonable consumer would not interpret the statement as a factual claim upon which he or she could rely.'" *Ault v. J.M. Smucker Co.*, No. 13 Civ. 3409 (PAC), 2014 WL 1998235, at *6

(S.D.N.Y. May 15, 2014) (citation omitted). The parties disagree over what a "CPO" designation means and conveys to consumers. According to Plaintiff, a CPO designation amounts to an affirmative claim about a vehicle's qualities and represents that it has undergone a prescribed certification process. In contrast, Defendants argue that a "CPO" designation merely means that the Vehicle comes with a CPO warranty issued by BMW NA. Defendants maintain that because Plaintiff received the CPO warranty from BMW NA, there can be no argument that Plaintiff did not receive the benefit of the bargain.

As the Court found earlier, WWC's representation to Plaintiff that the Vehicle she purchased was CPO creates an actionable warranty claim sufficient to survive summary judgment against WWC, and by virtue of its assignee status, against BMW Bank. *See* Section III.B, *supra*. Nonetheless, at trial Defendants are free to challenge Plaintiff's interpretation of "CPO." *See Ault*, 2014 WL 1998235, at *6 (a reasonable consumer's interpretation of a warranty is generally a "matter of fact"). Additionally, Defendants remain free to challenge Plaintiff's reasonable reliance on the Vehicle's CPO designation, a factual finding not amenable to summary judgment, and Plaintiff's position that the CPO designation was improper. These factual disputes make summary judgment in either parties' favor unwarranted. Accordingly, the Court denies Plaintiff's motion for summary judgment on the breach of express warranty claim.[11]

## C. Violations of GBL § 349 and § 350

Finally, Plaintiff moves for summary judgment on her claims for violations of GBL § 349 and § 350. (Docket No. 92 at 17-22). Defendants argue that triable issues of fact preclude summary judgment. (Docket No. 98 at 19-22; Docket No. 100 at 24-27).

---

[11] Revocation is a remedy for Plaintiff's breach of warranty claims. *See Diaz*, 424 F. Supp. 2d at 541 ("Under New York law, a purchaser may revoke his acceptance of goods 'whose non-conformity substantially impairs value to him'") (citation omitted). Because factual issues preclude summary judgment on these claims, summary judgment on the issue of revocation is similarly unwarranted.

To recover under GBL § 349 and § 350, a plaintiff must demonstrate "that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Koch v. Acker, Merrall & Condit Co.*, 944 N.Y.S.2d 452, 452 (2012). Contrary to WWC's argument that Plaintiff has not proven reliance, (Docket No. 98 at 20), "[j]ustifiable reliance by the plaintiff is not an element of the statutory claim." *Id.* at 453 (citing *Small v. Lorillard Tobacco Co.*, 698 N.Y.S.2d 615 (1999)).

As evidence in support of her GBL claims, Plaintiff points to: (1) WWC's history of selling CPO vehicles to individual consumers; (2) WWC's advertisement of the CPO program; (3) evidence that WWC used an unqualified individual to complete the Vehicle Inspection Checklist forms; (4) WWC's failure to provide Plaintiff with damage disclosure forms; and (5) a CARFAX report showing that the Vehicle Plaintiff purchased was not eligible for the CPO program. (Docket No. 92 at 19-20). The Court agrees with Defendants that Plaintiff's proffered evidence does not entitle Plaintiff to summary judgment. Defendants have raised evidence rebutting Plaintiff's claim that WWC engaged in deceptive and misleading practices, including evidence that the individual retained to complete the Vehicle Inspection Checklist was properly trained and evidence that WWC complied with the CPO program's mandates during the certification process. Thus, Plaintiff's motion is denied.

## V. CONCLUSION

For the foregoing reasons (1) WWC's motion to preclude Mr. Grismer's testimony is denied in part and granted in part; (2) WWC's motion for summary judgment is denied; (3) BMW Bank's motion for summary judgment in denied in part and granted in part; and (4) Plaintiff's motion for summary judgment is denied. The Clerk is respectfully requested to

terminate the pending motions. (Docket Nos. 77, 81, 85, 90).  The Court schedules a Status

Conference for March 20, 2019 at 10:30 a.m.

Dated:　　February 25, 2019
　　　　　White Plains, New York

**SO ORDERED:**

_____Judith C. McCarthy_____
JUDITH C. McCARTHY
United States Magistrate Judge